*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 05a0208p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

LUCE GILAJ and LUIGJ GILAJ,

*Petitioners,*

*v.*

No. 03-4307

ALBERTO GONZALES, Attorney General,

*Respondent.*

On Petition for Review of an Order of the
Board of Immigration Appeals.
Nos. A79 595 031; A79 595 032.

Argued: January 26, 2005

Decided and Filed: May 9, 2005

Before: MOORE and GILMAN, Circuit Judges; WEBER, District Judge.[*]

_____

**COUNSEL**

_____

**ARGUED:** Richard A. Kulics, IMMIGRATION LAW CENTER, Birmingham, Michigan, for
Petitioners. Alison R. Drucker, UNITED STATES DEPARTMENT OF JUSTICE, Washington,
D.C., for Respondent. **ON BRIEF:** Richard A. Kulics, IMMIGRATION LAW CENTER,
Birmingham, Michigan, for Petitioners. Emily A. Radford, Jennifer Keeney, Papu Sandhu, UNITED
STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

_____

**OPINION**

_____

PER CURIAM. Mrs. Luce Gilaj and Mr. Luigj Gilaj petition this court for review of a
decision by the Board of Immigration Appeals ("BIA") denying their requests for asylum,
withholding of removal, and protection under the Convention Against Torture. We have jurisdiction
to hear this petition pursuant to the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1252. For
the reasons discussed below, we **REVERSE** the determination of the BIA that petitioners failed to
establish eligibility for asylum on the basis of past persecution, and we **REMAND** the matter to the
BIA for further proceedings.

---

[*] The Honorable Herman J. Weber, Senior United States District Judge for the Southern District of Ohio, sitting
by designation.

1

# I. Background

### A.          Petitioners' requests for relief

Petitioners are husband and wife and citizens of Albania. They entered the United States together on or about November 2, 2000, as non-immigrant visitors for pleasure with authorization to remain in the United States until May 1, 2001. Petitioners remained in the country beyond that time. The Immigration and Naturalization Service ("INS") commenced removal proceedings pursuant to § 237(a)(1)(B) of the INA, 8 U.S.C. § 1227(a)(1)(B). Petitioners conceded removability. On October 31, 2001, Luce Gilaj filed an application for asylum under § 208 of the INA, 8 U.S.C. § 1158, and for withholding of removal under § 241(b)(3) of the INA, 8 U.S.C. § 1231(b)(3). Her application is also considered by the INS to be a request for protection under the Convention Against Torture. Mrs. Gilaj bases her requests for relief on a claim of past persecution or well-founded fear of future persecution on account of religion, membership in a particular social group, and political opinion. Luigj Gilaj seeks asylum and/or withholding of removal derivatively through Mrs. Gilaj.

### B.          The hearing on the merits

A hearing on the merits of petitioners' claims was held before an Immigration Judge (IJ) on April 29, 2002. At the asylum hearing, Mrs. Gilaj testified to a series of events beginning in 1997 and continuing through October of 2000 that she alleges proved a well-founded fear of persecution that would allow her to obtain asylum in the United States. The IJ determined that Mrs. Gilaj was generally credible. The testimony that she gave at the hearing is set forth below.

Mrs. Gilaj was active in the Democratic Party in Albania before coming to the United States with her husband. In June of 1997, she was involved in the election campaign for the Democratic Party. She went through the villages in her region to campaign for Democratic Party candidates. She was threatened by the police during this period, as were her husband and son. Her husband was wounded in the neck with a knife during a physical confrontation with Socialists on election day, June 29, 1997.

She remained active in politics after the June 1997 election. In September of 1998, the police searched her home for weapons. She was beaten during the search but suffered no serious injury. When she and her family asked the police for a search warrant, they replied that they did not need a warrant and that they could enter the house by force because they were Socialists who were going to make all of the Democrats suffer. At this time, her son was arrested, sent to jail for two days, and beaten.

The next incident occurred in early April of 2000. Mrs. Gilaj was the co-organizer of an anti-government protest in the main plaza of the town of Shkoder. She had worked to increase the number of people who attended the demonstration by going around her village, talking to the women, and encouraging them to attend the demonstration. She spoke at the demonstration. Nobody was arrested at the demonstration, but that evening she and her family received phone calls at home from unidentified people threatening that the family would "pay dearly" for her speech at the demonstration.

Several days after the protest, on April 11, 2000, two secret police officers came to the Gilaj home to question her about her work in the Democratic Party. Mr. Gilaj was not home at the time. The police started to threaten her and to ask about her son's address in the United States. The police made "verbal threats like we gonna (sic) kill you right now, we gonna (sic) suffocate you right now." They searched the house for weapons, tore up some of her notes, and "started to provoke [her] as a woman," an apparent reference to a sexual assault or molestation. The police were touching her when two relatives came into the house. The police left after having been in the house for approximately thirty minutes. She was not arrested, jailed, or beaten as a result of this incident.

Another incident occurred on October 5, 2000.  On that date, in the town of Koplik, thousands of people participated in a demonstration where Democratic Party members were protesting what they regarded as manipulation of elections by the Socialists.  Mrs. Gilaj was one of the demonstrators in the crowd.  She was arrested and jailed for two days.  She was denied food during her detention.  Mrs. Gilaj was one of twelve to fourteen people in her cell, and she heard later that fifty to sixty people had been arrested.  Mrs. Gilaj was beaten by the police during this time. She sustained bruises but no serious injuries.  While she was in jail, the police grabbed a cross from around her neck, threw it on the floor, told her to step on it, slapped her face when she bent over to retrieve it, and said that the Muslim majority would "disappear" all Catholics from Albania.  After being released from jail, Mrs. Gilaj went to the health center in her village and received pills for the pain resulting from the beating.

At the demonstration leading to Mrs. Gilaj's detention, Mr. Gilaj sustained a leg wound when the police, who were beating the protestors, hit him with their boots.  Although Mrs. Gilaj testified that her husband was not arrested at this time, Mr. Gilaj testified that he was arrested and jailed for two days.

After Mrs. Gilaj's release from jail, she went home and received a number of phone calls threatening to make her and her husband "disappear."  Shortly thereafter, she arrived in the United States with her husband after obtaining a visitor's visa.  Mrs. Gilaj believes that, if she were required to return to Albania, she would be persecuted, and perhaps killed, as a consequence of her activities prior to leaving Albania.

## C.     The IJ's decision

At the conclusion of the hearing, the IJ denied the application for asylum, withholding of removal pursuant to § 241(b)(3) of the INA, and protection under the Convention Against Torture. The IJ found petitioners' testimony to be generally credible, despite certain discrepancies.  The IJ determined that there was no dispute that Mrs. Gilaj had been active with the Democratic Party in Albania.  The IJ found, however, that when the incidents that had occurred as a result of her activities are considered in the aggregate, they do not rise to the level of persecution.  The IJ therefore concluded that Mrs. Gilaj had not established either persecution or a well-founded fear of persecution on the basis of her political activity, and that it followed from this finding regarding asylum that Mrs. Gilaj had not met the burden of establishing eligibility for withholding of removal pursuant to § 241(b)(3).  The IJ further determined that Mrs. Gilaj had not established eligibility for protection under the Convention Against Torture because she had not proved that it was "more likely than not" that she would be tortured if she were forced to return to Albania.

## D.     The BIA's decision

Mrs. Gilaj appealed to the BIA from the IJ's denial of her application.  The BIA affirmed the IJ's decision for the reasons stated therein and dismissed the appeal.  The BIA summarily stated that it concurred in the IJ's determination that Mrs. Gilaj had not demonstrated that she had suffered harm sufficiently serious as to constitute persecution within the meaning of the INA.  The BIA made one specific comment in this regard, noting that Mrs. Gilaj had not specified in her application, in her testimony, or on appeal how the men who came to her house on April 11, 2000, had attempted to "provoke" her as a woman.  Second, the BIA addressed Mrs. Gilaj's argument that the IJ had erred in not offering her an opportunity to make a closing argument at the conclusion of the hearing on the merits.  The BIA acknowledged that parties generally should be allowed to make closing arguments.  The BIA found, however, that even if the IJ had erred in this regard, the error may be considered to be harmless.  The BIA noted that Mrs. Gilaj had specifically rested her case, through counsel, without asking to make a closing argument.  The BIA also determined that Mrs. Gilaj had

not explained with any particularity what arguments she would have presented in a closing argument or how the outcome of her case might have been different had a closing argument been made.

## E.    Petitioners' objections

Petitioners argue in support of their petition for review that the IJ and BIA misinterpreted the definition of "persecution," improperly considered, disregarded, and/or distorted substantial evidence submitted in support of the application, and made a decision against the great weight of the evidence.  Petitioners contend that the issue to be resolved is whether a reasonable person would consider the actions taken against them to be "offensive."  In arguing that such actions are offensive and constitute persecution, petitioners place heavy reliance on a publication that they characterize as the "primer for adducing whether an activity constitutes persecution," which is the United Nations High Commissioner for Refugees' *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees* (2d ed. 1992).  Petitioners place particular emphasis on ¶ 51 of the Handbook, which they contend defines "persecution" as "an unjustified threat of serious harm, including but not limited to a threat to life or freedom."  Petitioners assert that the United Supreme Court has acknowledged that a prior edition of the Handbook provides "significant guidance" in construing the definition of "refugee." *See INS v. Cardoza-Fonseca,* 480 U.S. 421, 438-39, 107 S.Ct. 1207, 1217 (1987).  Petitioners argue that being targeted for mistreatment and subjected to serious threats and attacks by "politically-motivated thugs" associated with the political party that was to become the government of Albania rises well above mere harassment and constitutes persecution.

Petitioners further allege that they were denied the due process to which aliens are entitled in connection with deportation proceedings as a result of the IJ's failure to allow a closing argument at the hearing on the merits.  Petitioners claim that a closing argument is part of a fair hearing and that the denial of an opportunity to present one resulted in a fundamentally unfair decision.

Finally, petitioners claim that the IJ and the BIA abused their discretion in denying petitioners' claims for relief.  Petitioners argue that, given the facts described in their testimony, the case appears to have been decided contrary to established policy and precedent.  In particular, petitioners argue that the BIA's concern with an alleged lack of specificity in Mrs. Gilaj's testimony as to how police officers "provoked [her] as a woman" demonstrates the inadequacy of the BIA's decision-making.

## II. Analysis

### A.    Review of the BIA's decision

Where the BIA adopts the IJ's reasoning, the court reviews the IJ's decision directly to determine whether the decision of the BIA should be upheld on appeal. *Denko v. INS*, 351 F.3d 717, 723 (6th Cir. 2003).  In this case, the BIA summarily adopted the IJ's decision while adding a comment on the lack of specificity as to one portion of the testimony and making a finding on petitioners' due process claim.  We therefore directly review the decision of the IJ while considering the additional comment made by the BIA.  Because the due process claim was not before the IJ, we directly review the BIA's decision on that claim.

### B.    Petitioners' claim of past persecution

The United States Attorney General has discretion under the INA, 8 U.S.C. § 1158(a), to grant asylum to a "refugee." *Perkovic v. INS,* 33 F.3d 615, 620 (6th Cir. 1994).  The disposition of an application for asylum involves a two-step inquiry: (1) whether the applicant qualifies as a "refugee" as defined in 8 U.S.C. § 1101(a)(42)(A), and (2) whether the applicant "merits a favorable

exercise of discretion by the Attorney General." *Id.* (citing *Cardoza-Fonseca,* 480 U.S. at 428 n.5, 107 S.Ct. at 1211 n.5).

The burden is on the applicant to establish that he or she qualifies as a refugee. 8 C.F.R. § 1208.13(a)-(b). The applicant's testimony, if credible, "may be sufficient to sustain the burden of proof without corroboration." 8 C.F.R. § 1208.13(a).

The court reviews the factual determination of whether a petitioner qualifies as a refugee under a "substantial evidence" test. *Yu v. Ashcroft,* 364 F.3d 700, 702 (6th Cir. 2004). The court may reverse the BIA's determination if the evidence "not only supports a contrary conclusion, but indeed *compels* it." *Ouda v. INS,* 324 F.3d 445, 451 (6th Cir. 2003). The petitioner must demonstrate "that the evidence presented was so compelling that no reasonable factfinder could fail to find the requisite persecution or fear of persecution." *Id.*

The INA, 8 U.S.C. § 1101(a)(42)(A), defines a "refugee" as an alien who is unable or unwilling to return to his or her home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . . ." Thus, there are two alternative methods by which an applicant for asylum may establish eligibility for asylum: (1) the applicant can prove that he or she has suffered past persecution, or (2) the applicant can show that he or she has a well-founded fear of future persecution. 8 C.F.R. § 208.13(b); *see Matter of Chen,* 20 I. & N. Dec. 16, 18, 1989 WL 331860 (BIA 1989) (citations omitted).

In order to demonstrate eligibility for asylum on the basis of a well-founded fear of persecution, an applicant must establish that: (1) he or she "has a fear of persecution in his or her country of nationality . . . on account of race, religion, nationality, membership in a particular social group, or political opinion;" (2) "There is a reasonable possibility of suffering such persecution if he or she were to return to that country;" and (3) "He or she is unable or unwilling to return to, or avail himself or herself of the protection of, that country because of such fear." 8 C.F.R. 1208.13(b)(2)(i). "A well-founded fear of persecution has both a subjective and an objective component." *See Perkovic,* 33 F.3d at 620. An applicant "must actually fear that he will be persecuted upon return to his country, and he must present evidence establishing an 'objective situation' under which his fear can be deemed reasonable." *Id.* at 620-21 (citing *Cardoza-Fonseca,* 480 U.S. at 430-31, 440, 107 S.Ct. at 1212-1213, 1217). The applicant, however, is not required "to show that he probably will be persecuted if he is deported; '[o]ne can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking place.'" *Id.* at 621 (quoting *Cardoza-Fonseca,* 480 U.S. at 431, 107 S.Ct. at 1213).

The INA provides no definition of "persecution." In *Mikhailevitch v. INS,* 146 F.3d 384 (6th Cir. 1998), this court reviewed numerous cases from other circuits in an attempt to discern the meaning of the term within the context of the INA. The court determined that "'persecution' within the meaning of 8 U.S.C. § 1101(a)(42)(A) requires more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty." *Id.* at 390.

*Mikhailevitch* has not been interpreted as "suggesting that physical punishment is in all cases *sufficient* for finding persecution." *Gjokic v. Ashcroft,* Nos. 02-3915, 02-3917, 2004 WL 1491638, at * 4, 104 Fed.Appx. 501 (6th Cir. June 29, 2004) (unpublished) (citing *Mikhailevitch,* 146 F.3d at 390). Rather, as the court in *Gjokic* emphasized, *Mikhailevitch* states only that "something 'more than a few isolated incidents of verbal harassment or intimidation unaccompanied by any physical punishment' is *necessary* for finding persecution . . . ." *Id.* (citing *Mikhailevitch,* 146 F.3d at 390). The court in *Gjokic* relied on this language in *Mikhailevitch* and on several decisions from other circuits in determining that "while even a single beating offends one's sense of civilized

governmental conduct, a single beating does not *compel* a finding of persecution . . . ." *Id.* (citing *Dandan v. Ashcroft*, 339 F.3d 567, 574 (7th Cir. 2003) ("being detained, beaten and deprived of food for three days did not compel a finding of persecution); *Prasad v. INS,* 47 F.3d 336, 339-40 (9th Cir.1995) ("'[a]lthough a reasonable fact-finder *could* have found' a brief detention and beating requiring no medical care 'sufficient to establish past persecution . . . a fact-finder would [not] be compelled to do so'"); *Kapcia v. INS,* 944 F.2d 702, 704, 707 (10th Cir.1991) ("being 'detained for a two-day period [and] . . . interrogated and beaten' did not compel a finding of past persecution"); *Skalak v. INS,* 944 F.2d 364, 365 (7th Cir.1991) ("The function [of the past- persecution inquiry] is to identify persecution so severe that perhaps a person should not be forced to return to the country in which she underwent it even if the danger of recurrence is negligible.").

Consistent with these decisions, the court in *Gjokic* upheld a finding of no persecution as to an alien who had been detained for several days following his attendance at a demonstration and who had been beaten by the police with rubber sticks, which caused bruising but no permanent injuries. The court found that, in addition to considering the length of the detention and the severity of the physical harm, the IJ had properly considered "the context of the demonstration" that the alien had attended. *Id.* at *5. Specifically, the petitioner had not led, or spoken at, any demonstrations, and he had not distinguished himself from the thousands of other demonstrators. *Id.* Moreover, the petitioner had not been beaten or detained again during the one and one-half years between the incident on which he based his claim of past persecution and the time he left his home country. *Id.*

Another panel of this court has indicated what types of conduct may rise to the level of persecution by quoting with approval the following language from a Seventh Circuit decision:

> Persecution encompasses more than threats to life or freedom; non-life threatening violence and physical abuse also fall within this category. However, to sustain an asylum application, the conduct must rise above mere harassment. Types of actions that might cross the line from harassment to persecution include: detention, arrest, interrogation, prosecution, imprisonment, illegal searches, confiscation of property, surveillance, beatings, or torture.

*De Leon v. INS,* No. 02-4148, 2004 WL 1088243, at * 1, 99 Fed.Appx. 597 (6th Cir. May 12, 2004) (unpublished) (quoting *Begzatowski v. INS,* 278 F.3d 665, 669 (7th Cir. 2002)).

In addition to examining the nature of the conduct on which an application for asylum is based, we have looked to the overall context of the applicant's situation to ascertain whether the applicant has been subjected to persecution within the meaning of the INA so as to give rise to a presumption of a well-founded fear of future persecution. *See, e.g., Pilica v. Aschcroft,* 388 F.3d 941, 954 (6th Cir. 2004); *Gjokic,* 2004 WL 1491638. Our decisions demonstrate that to create a presumption of a well-founded fear of future persecution, the applicant must establish that he or she was specifically targeted by the government for abuse based on a statutorily protected ground and was not merely a victim of indiscriminate mistreatment. For instance, in *Pilica,* the court deemed it significant that "[t]here is no indication that [the applicant] is on some governmental blacklist; indeed, all of the occurrences that arguably constitute past persecution resulted directly from Pilica's attendance at a demonstration rather than from the government having sought him out." 388 F.3d at 955. Similarly, as noted above, the panel in *Gjokic* relied on the fact that the petitioner had not led, or spoken at, any demonstrations, he had not distinguished himself from the thousands of other demonstrators, and he was never detained or beaten again. 2004 WL 1491638, at *5.

The numerous decisions rendered by the various panels of this court upon review of BIA decisions on applications for asylum make clear that the conduct on which the application for asylum is based must go beyond what might reasonably be characterized as mere harassment in order to rise to the level of persecution. It is equally clear that the characterization of conduct as

persecution does not necessarily turn on the severity of the conduct itself or on the frequency of the alleged incidents. Indeed, courts have held that even a single incident may be sufficient to establish past persecution. *See, e.g., Corado v. Ashcroft,* 384 F.3d 945, 947-48 (8th Cir. 2004); *Guo v. Ashcroft,* 361 F.3d 1194, 1203-04 (9th Cir. 2004); *Asani v. INS,* 154 F.3d 719, 723-24 (7th Cir. 1998). Rather, the critical factor is the overall context in which the harmful conduct occurred. It is not sufficient that the applicant has been subjected to indiscriminate abuse, such as physical force or violence employed against a crowd of demonstrators, or has been the victim of a random crime. Instead, the applicant must establish that he or she was specifically targeted by the government for abuse based on one of the statutorily protected grounds. If the applicant can make this showing, then the court should consider whether the applicant was subjected to physical harm and suffering or simply verbal threats and intimidation, and the gravity of the circumstances presented.

When reviewed in light of the case law addressing the meaning of "persecution" within the context of the INA, the IJ's decision that the incidents described by petitioners do not rise to the level of persecution is not supported by substantial evidence. The IJ found petitioners to be credible, so we must accept the representations petitioners made in the application and their testimony as true. The testimony establishes that petitioners were specifically targeted for abuse based on their political opinions and activities and that the abuse exceeded verbal harassment and intimidation and consisted of more than a single beating or other isolated occurrence. The Gilaj family was subjected to searches of their home by the police on two occasions, with the police telling the family during the first search that they could enter the home by force because they were Socialists and they were going to make Democrats suffer, and then making threats to kill and suffocate Mrs. Gilaj during the second search. In addition to these incidents, petitioners were subjected to physical abuse and infliction of harm and suffering on several occasions. Mrs. Gilaj was beaten during the first search of her home in September of 1998. She was detained for two days in October of 2000, during which time she was deprived of food and beaten with rubber sticks, slapped, and punched, resulting in bruising and pain for which she obtained medication following her release. Mrs. Gilaj apparently was also the victim of a sexual offense, or an attempted sexual offense, by the police, which was thwarted only by the timely arrival of her relatives. Finally, Mrs. Gilaj and her family received numerous telephone threats, including death threats made as recently as the month preceding Mr. and Mrs. Gilaj's departure from Albania.

The IJ recounted much of this testimony when setting forth the substance of petitioners' claims. In determining that the incidents that petitioners had described did not constitute persecution, however, the IJ apparently failed to take into account the fact that Mrs. Gilaj and her family had been specifically targeted by their government for abuse based on Mrs. Gilaj's political activities. Moreover, the IJ inexplicably downplayed the severity of the conduct, omitted serious incidents from consideration, and failed to consider in the aggregate all of the incidents that he did take into account. The IJ summarized the conduct on which he based his determination that Mrs. Gilaj had not been subjected to persecution as follows:

> [Mrs. Gilaj] testified that she participated in demonstrations, that she sought to increase Democratic party support in her part of the country. She testified that as a result of her activities she was threatened by the opposing party, and perhaps by the police. She testified that her house was searched, and she testified that she was held for two days after one demonstration. She also testified that she did not suffer any serious injuries as a result of her time in custody. When these incidents are considered in the aggregate, this Court cannot find that they rise to the level of persecution. This is not to minimize the difficulty of being active politically in a country, such as Albania, with no tradition of democracy. Similarly, the Court finds that the threats that respondent may have received as a result of her political activity do not constitute past persecution.

It is disturbing to see that, in his summary of the incidents on which he based his decision, the IJ made no mention of the fact Mrs. Gilaj had been beaten during the first search of her home; that during the second search of her home, the police had threatened to suffocate and kill her; that she had been beaten and bruised and deprived of food during her two-day detention; and that the police apparently had sexually assaulted or molested her, or had attempted to do so, during the second search of her home. The IJ instead reduced the conduct that petitioners had endured to a few isolated occurrences and described them in such a way that, if one were to read only the IJ's summary of the testimony, one could easily conclude that Mrs. Gilaj had been subjected to nothing more than some annoying and rather innocuous behavior. In reality, the testimony paints a much more ominous picture of a victim specifically targeted by her government for physical and psychological abuse because of her political opinions and activities. By omitting to take into account each of the serious occurrences that petitioners had described, the IJ failed to consider all of the material information bearing upon the issue of whether Mrs. Gilaj had been subjected to past persecution. Moreover, the IJ apparently did not consider the threats against the family and the other incidents in conjunction with each other, instead separately concluding that any threats that Mrs. Gilaj may have received as a result of her political activity did not constitute past persecution.

When all of the incidents to which petitioners testified are taken into account and considered in the aggregate and in light of the overall context of the Gilaj family's situation, the record compels a finding that Mrs. Gilaj was subjected by her government to past persecution on account of political activities and opinion. These incidents go well beyond the types of conduct that this court has held do not constitute persecution. Petitioners did not testify merely to "a few isolated incidents of verbal harassment or intimidation unaccompanied by any physical punishment," or to a single beating or other remote occurrence. Nor did petitioners show only that they were the victims of indiscriminate abuse or random violence. Instead, petitioners demonstrated that they were the intended targets of a series of incidents that consisted of physical punishment, threats to petitioners' lives, detentions, illegal searches, and an apparent sexual offense or attempted sexual offense by government agents, because of political activities and opinion. The IJ's determination that these incidents do not constitute past persecution simply is not supported by substantial evidence.

The BIA did not correct the IJ's errors, but instead further distorted the record in rendering its decision. After generally stating that it concurred in the IJ's determination that Mrs. Gilaj had not demonstrated that she had suffered harm sufficiently serious as to constitute persecution, the BIA noted in particular that Mrs. Gilaj had not specified "how the men who came to her house on April 11, 2000, attempted to 'provoke' her as a woman." Although Mrs. Gilaj's testimony was vague in this regard, it was nonetheless sufficiently clear to show that Mrs. Gilaj had been subjected to an attempted assault or molestation of a sexual nature but was too ashamed to provide details regarding the incident. When Mrs. Gilaj was asked at the hearing what she meant by the police "started to provoke me as woman," she responded, "I, I cannot express it, I'm ashamed, they started to touch me." Mrs. Gilaj also indicated during her testimony that, upon arriving at her home at the time of the incident, her relatives found her "crying there, and with [her] blouse tore up and unbuttoned." This testimony suffices to show what Mrs. Gilaj meant when she stated that the police started to provoke her as a woman. It is understandable that Mrs. Gilaj would be hesitant to provide any more details, and no one prompted her to do so at the hearing. Given the testimony that Mrs. Gilaj did provide and her apparent reluctance to go into embarrassing detail, the BIA's reliance on this ambiguity in the record to support a finding of a lack of sufficiently serious harm is simply not justified. A reasonable adjudicator would be compelled to conclude that the incidents described by petitioners rise to the level of "persecution" as that term has been developed in the case law, and the BIA's decision to the contrary is not supported by substantial evidence. We therefore cannot uphold the BIA's decision.

## C.        Discretionary grant of asylum

Even if an applicant satisfies the burden of establishing that he or she qualifies as a refugee on the basis of either past persecution or a well-founded fear of persecution, the BIA, in its discretion, may deny asylum. *Cardoza-Fonseca,* 480 U.S. at 421 n.5, 107 S.Ct. at 1211 n.5. The BIA's discretionary judgment whether to grant relief on an application for asylum is "conclusive unless manifestly contrary to law and an abuse of discretion." 8 U.S.C. § 1252(b)(4)(D). An abuse of discretion occurs when the BIA exercises its discretion in a way that is arbitrary, irrational, or contrary to law. *Daneshvar v. Ashcroft,* 355 F.3d 615, 625-26 (6th Cir. 2004) (citation omitted).

When an applicant has satisfied his or her burden of establishing past persecution based on a statutory ground so as to be eligible for a grant of asylum, the "likelihood of present or future persecution then becomes relevant as to the [BIA's] exercise of discretion. . ." *Matter of Chen,* 20 I. & N. Dec. at 18, 1989 WL 331860. An alien who has been persecuted in the past is presumed to have a well-founded fear of persecution based on the original claim. 8 C.F.R. § 1208.13(b)(1). The government may rebut that presumption through establishing by a preponderance of the evidence either that (1) since the persecution occurred, conditions in the applicant's country have changed to such an extent that the applicant no longer has a well-founded fear of being persecuted on one of the statutory grounds if he or she were to return, or (2) the applicant could avoid future persecution by moving to another part of his or her country of nationality, and it would be reasonable to expect the applicant to do so. 8 C.F.R. § 1208.13(b)(1)(i)(A)-(B). In addition, an applicant who has suffered past persecution, but who does not have a well-founded fear of persecution, may be granted asylum if the applicant "has demonstrated compelling reasons for being unwilling or unable to return to the country arising out of the severity of the past persecution" or "has established that there is a reasonable possibility that he or she may suffer other serious harm upon removal to that country." 8 C.F.R. § 1208.13(b)(1)(iii)(A)-(B).

Because the IJ determined that Mrs. Gilaj had failed to establish past persecution, the IJ made only a cursory determination that she had not established a well-founded fear of persecution based on her political activity. Having found no past persecution, the IJ did not apply a presumption of a well-founded fear of future persecution and shift to the government the burden to rebut that presumption. The IJ did not examine the record and consider whether there has been a fundamental change in circumstances such that petitioners no longer have a well-founded fear of persecution; whether they could avoid persecution by relocating to another part of Albania; whether petitioners have shown compelling reasons for being unwilling or unable to return to Albania arising out of the past persecution; or whether there is a reasonable possibility that they may suffer other serious harm if removed to Albania. There is documentation in the record that suggests that conditions in Albania have changed in recent years, and petitioners therefore may be unable to establish that they have a well-founded fear that they will be persecuted if forced to return to Albania. This determination, however, is for the BIA to make in the first instance. *See INS v. Ventura,* 537 U.S. 12, 123 S.Ct. 353 (2002). Accordingly, the appropriate course is to remand this matter to the BIA for additional fact-finding and determination of the issues bearing on the discretionary decision of whether to grant asylum.

## D.        Request for withholding of removal

In addition to requesting asylum in her application, Mrs. Gilaj requested withholding of removal pursuant to § 241(b)(3) of the INA, 8 U.S.C. § 1231(b)(3). Section 241(b)(3) provides that "the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." In order to be entitled to relief on an application for withholding of removal, an alien must establish that there is a "clear probability" that he or she will be subject to persecution if forced to return to the country of removal.

*Mikhailevitch,* 146 F.3d at 391 (citing *Ivezaj v. INS,* 84 F.3d 215, 221 (6th Cir. 1996)). The administrative findings of fact "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B).

Respondent contends that we lack jurisdiction to consider the issue of withholding of removal because Mrs. Gilaj failed to raise the issue in her brief filed with the BIA. Respondent also argues that petitioners have abandoned their claim for withholding of removal by failing to challenge the denial of that claim on appeal.

In an appeal from an order of removal, we have jurisdiction to review only those claims for which the applicant has exhausted the administrative remedies available to the alien as a matter of right. 8 U.S.C. § 1252(d)(1); *Ramani v. Ashcroft,* 378 F.3d 554, 560 (6th Cir. 2004). Only those claims that have been properly presented to the BIA and considered on their merits can be reviewed by the court in an immigration appeal. *Ramani,* 378 F.3d at 560.

Petitioners argued before the BIA that the IJ had erred in finding that the incidents described by petitioners did not constitute persecution. Their argument is pertinent to both the claim for asylum and the claim for withholding of removal. Accordingly, we find that petitioners properly presented the issue of withholding of removal to the BIA for its determination. In addition, petitioners presented the issue to this court by arguing in their appellate brief that the IJ and the BIA had abused their discretion by denying both the claim for asylum and the claim for withholding of removal. Accordingly, petitioners have not waived their claim for withholding of removal, and we have jurisdiction to hear the claim.

The IJ relied solely on the finding regarding asylum in determining that Mrs. Gilaj could not meet the more stringent burden of establishing eligibility for withholding of removal. The IJ did not examine the evidence and make specific findings regarding the probability that Mrs. Gilaj would be subject to persecution if she were forced to return to Albania. Thus, the BIA should consider on remand whether petitioners are entitled to withholding of removal based on all of the evidence of record.

### E.          Petitioners' claim for protection under the Convention Against Torture.

Petitioners did not address their right to protection under the Convention Against Torture in either their Notice of Appeal to the BIA or in their brief filed in support of their appeal to the BIA. Petitioners therefore failed to exhaust their administration remedies as to this claim, and we lack jurisdiction to review the issue.

### F.          Petitioners' due process claim

Petitioners claimed before the BIA that the IJ's failure to offer them an opportunity to make a closing argument resulted in a fundamentally unfair conclusion. Petitioners argue before this court that the IJ's failure to allow a closing argument at the hearing on the merits denied them the due process to which aliens are entitled in connection with deportation proceedings.

Aliens are entitled to due process of law in deportation proceedings. *Denko,* 351 F.3d at 726 (citing *Reno v. Flores,* 507 U.S. 292, 306, 113 S.Ct. 1439 (1993)). Due process requires that an alien be afforded a full and fair hearing. *Castellano-Chacon v. INS,* 341 F.3d 533, 553 (6th Cir. 2003) (citing *Mikhailevitch,* 146 F.3d at 391). Claims of due process violations in deportation proceedings are reviewed *de novo. Id.* at 552-53 (citing *Mikhailevitch,* 146 F.3d at 391).

This court has acknowledged, in the context of deportation proceedings, that "opening and closing arguments are critically important in sharpening and clarifying issues for resolution in our adversary system." *Castellano-Chacon,* 341 F.3d at 553. Denial of the opportunity to present

opening statements or closing arguments at a deportation proceeding may constitute a due process violation. *Id.* Where, however, the alien has failed to identify specific prejudice resulting from denial of the opportunity to present an opening statement or closing argument, the error is harmless. *Id.*

Petitioners are not entitled to relief based on the claimed due process violation. Petitioners did not request, through their attorney, that they be permitted to make a closing argument, and so it is not fair to say that the IJ denied them an opportunity to present one. Moreover, petitioners have failed to show that they were prejudiced by the IJ's failure to offer them an opportunity to make a closing argument. There is no indication in the record that the outcome of the proceeding would have been different had a closing argument been presented on petitioners' behalf. Accordingly, if the IJ did err in this regard, the error is harmless.

### III. Conclusion

For all of the reasons set forth above, the petition for review of the decision of the BIA denying petitioners' requests for asylum and withholding of removal is **GRANTED.** We **REVERSE** the decision of the BIA that petitioners failed to establish eligibility for asylum on the basis of past persecution. We **REMAND** the matter to the BIA for a determination of whether petitioners are entitled to a discretionary grant of asylum and/or to withholding of removal in light of all of the evidence of record.