RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 07a0421p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

NIKOLAI KOULJINSKI,

*Petitioner,*

*v.*

No. 06-4016

PETER D. KEISLER,<sup>*</sup> Acting Attorney General of the
United States,

*Respondent.*

On Petition for Review of an Order
of the Board of Immigration Appeals.
No. A72 142 173.

Argued: September 17, 2007

Decided and Filed: October 16, 2007

Before: MOORE and GRIFFIN, Circuit Judges; GRAHAM, District Judge.[**]

_____

## COUNSEL

**ARGUED:** Scott A. Keillor, Ypsilanti, Michigan, for Petitioner. Kristin K. Edison, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Scott A. Keillor, Ypsilanti, Michigan, for Petitioner. Kristin K. Edison, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

_____

## OPINION

_____

KAREN NELSON MOORE, Circuit Judge. After finding that an alien is eligible for asylum, may an immigration judge consider the alien's three convictions for driving under the influence of alcohol in denying the application for asylum as a matter of discretion? That is the principal question in this appeal, and because we conclude that an immigration judge may properly consider

_____

[*]Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Acting Attorney General Peter D. Keisler is automatically substituted for former Attorney General Alberto R. Gonzales.

[**]The Honorable James L. Graham, United States District Judge for the Southern District of Ohio, sitting by designation.

1

such convictions, we **DENY** Nikolai Kouljinski's petition for review of the decision of the Board of Immigration Appeals denying his application for asylum and withholding of removal.

## I. BACKGROUND

### A. Procedural History

Petitioner Nikolai Kouljinski ("Kouljinski"), now a fifty-five year-old Russian Jew, entered the United States in October 1992 and filed an application for asylum in November 1992 with the former Immigration and Naturalization Service ("INS"). Joint Appendix ("J.A.") at 680-84 (1992 Request for Asylum), 698-708 (2004 Application for Asylum). In June 1995, Kouljinski learned that his wife had been involved in a serious car accident in Russia, and he returned to Russia after first receiving advance parole, which allowed him to reenter the United States and not abandon his application for asylum. J.A. at 611-13 (Authorization for Parole), 141 (Hr'g Tr. at 74). He returned to the United States on August 11, 1995, and his wife and daughter followed him to the United States on December 11, 1995.

On August 14, 2002, the former INS initiated removal proceedings against Kouljinski, alleging that, pursuant to 8 U.S.C. § 1182(a)(7)(A)(i)(I), he was removable for entering the United States without valid documents. J.A. at 709-10 (Notice to Appear in Immigration Court). On November 26, 2003, at an initial Master Calendar hearing, the immigration judge ("IJ"), noting that Kouljinski had originally applied for asylum in 1992, scheduled a second hearing for February 20, 2004, at which time Kouljinski was to submit an updated application for asylum. J.A. at 163-68 (Transcript of Master Calendar Hearing). Kouljinski submitted an updated application for asylum at a brief hearing on February 20, 2004, at which he was represented by his current counsel. J.A. at 698-708 (Application for Asylum), 158-162 (Transcript of Hearing). Kouljinski sought asylum, withholding of removal under the Immigration and Nationality Act ("INA"), and withholding of removal under the Convention Against Torture ("CAT"). On August 13, 2004, an IJ held a hearing at which Kouljinski's attorney, the Department of Homeland Security's attorney, and the IJ discussed the parties' evidentiary submissions in advance of the asylum hearing. J.A. at 149-57 (Transcript of Hearing). On November 12, 2004, the IJ held a hearing on Kouljinski's asylum application. J.A. at 84-148 (Transcript of Hearing). At this hearing, Kouljinski and his wife, Alla Kouljinski ("Ms. Kouljinski"), testified regarding instances of harassment and intimidation that they experienced in Russia and attributed to anti-Semitism.

The IJ rendered an oral decision at the conclusion of the hearing. J.A. at 10-24 (Transcript of Oral Decision). The IJ denied Kouljinski's applications for asylum, withholding of removal under the INA, and withholding of removal under the CAT. The IJ did so after first finding Kouljinski eligible for asylum—he "conclu[ded] that [Kouljinski], in my view, has established a reasonable possibility of persecution," J.A. at 22—but the IJ denied Kouljinski asylum because he "reached the conclusion that a favorable exercise of discretion in this case is unwarranted." J.A. at 24. In doing so, the IJ decided that Kouljinski's eligibility for asylum was not "a sufficiently weighty favorable discretionary factor to outweigh the fact that [he] has three convictions for driving under the influence" of alcohol, noting that Kouljinski's most recent conviction was a felony offense. J.A. at 23.

Kouljinski timely appealed to the BIA, where he argued that the IJ abused his discretion in denying asylum based on Kouljinski's drunk-driving convictions and his lack of family ties to the United States given that his wife and daughter are currently in the United States. Kouljinski also challenged the IJ's findings as to past persecution and as to a likelihood of future persecution and torture, arguing that he had established the higher showing necessary to mandate withholding of removal under the INA and under the CAT.

On June 23, 2006, the BIA adopted and affirmed the IJ's decision and dismissed the appeal. J.A. at 8-9. Kouljinski filed a timely petition for review in this court of the BIA's decision.

## B. The Hearing

At the hearing on November 12, 2004, Kouljinski testified that he was born in Leningrad, Russia, in 1952, that he is Jewish, that he had been married to his wife for over twenty years, and that they have a daughter, then sixteen years old. Kouljinski testified that his employment options in the former Soviet Union were limited because, as a Jew, he could not be a member of the Communist Party. In 1980, when he was working for a restaurant, Kouljinski's application for a managerial position was "not approved by the District Party Committee," and he stated that the District Party Committee "sen[t] documents to me suggesting that I need to quit." J.A. at 102 (Hr'g Tr. at 35). As a result of that pressure, Kouljinski quit; to obtain another position he moved from Leningrad to Kronstadt, a city twenty kilometers from Leningrad. KGB agents then demanded that he report to them while he was working in Kronstadt. While he was working as a bartender in an establishment frequented by military personnel, the KGB arrested him and detained him overnight, demanding that he listen to conversations in the bar and pass along information to the KGB about anyone planning to leave the Soviet Union and seek asylum elsewhere.

After his father died in the late 1980s, Kouljinski learned from some of his father's papers how to manufacture jewelry that resembled Fabergé products; once it became legal to do so, he started his own business. Soon thereafter, Kouljinski faced problems from racketeers, who pressured him to manufacture counterfeit Fabergé products, but he refused. On his application for asylum, Kouljinski stated that an entity called the "Ost Corporation" began threatening and pressuring him, demanding that he merge his business with theirs because his jewelry-making "was a 'Russian' practice and tradition, part of the Russian culture, and therefore not suitable for Jews." J.A. at 708 (2004 Asylum Application). Ms. Kouljinski testified that they frequently received threatening calls at night and that windows in their house were broken. The racketeers demanded thirty percent of his revenue, and Kouljinski testified that when he attempted to report the extortion to the police, he was laughed at. Ultimately, Kouljinski decided to shut down his production and flee to the United States.

While Kouljinski was in the United States, his wife continued to experience harassment in Russia. Ms. Kouljinski testified that she received threats, with callers telling her that "we know that your husband got out . . . and you should leave with him, because you're even worse than him. You married a Jew." J.A. at 136 (Hr'g Tr. at 69). She also claimed that callers directed threats at their daughter. In 1995, Ms. Kouljinski was involved in a serious car accident, and she testified that the other car "collided with my vehicle at a very high speed" and that she spent over two weeks in the hospital due to her injuries. J.A. at 137-38 (Hr'g Tr. at 70-71). Her mother began receiving threats over the phone, with the callers "saying that if your daughter doesn't leave the country with her offspring, then she would lose her life." J.A. at 138 (Hr'g Tr. at 71). At this time, her mother called Kouljinski, who returned to Russia. On his 2004 asylum application, Kouljinski stated that he believed the auto accident "was caused by persons associated with members of the Ost Corp." J.A. at 708 (2004 Asylum Applic.). He admitted on cross-examination at his asylum hearing that he had no personal knowledge regarding the circumstances of the accident.

Ms. Kouljinski filed a lawsuit in Russia against the other driver, and Kouljinski's asylum application stated that "[e]ven though she won in court, the courts have never enforced the judgment." J.A. at 708 (2004 Asylum Applic.). When Ms. Kouljinski testified about the car accident, she said that her suit "never got to the Court." J.A. at 142 (Hr'g Tr. at 75). The government noted that a document submitted in Kouljinski's asylum application stated that a judgment had been granted on her claim in the amount of some three thousand U.S. dollars. J.A. at 142 (Hr'g Tr. at 75), 279 (Letter from Saint Petersburg Attorney German Natus). Ms. Kouljinski

replied that they had never received any payment and that her attorney informed her that the other party has twenty years to pay the judgment.

Both Kouljinski and his wife described episodes involving the brief kidnapping of their daughter. Kouljinski testified that when he returned to Russia in 1995, while his daughter was playing outside one day, he received a phone call in which he was told that the caller had his daughter in a car. He stated that the caller wanted the documents regarding his jewelry manufacturing process, and he immediately agreed to hand over the documents. He claimed that "when I got outside, my daughter was already returned to me. It all took not more than 15 minutes." J.A. at 121-22 (Hr'g Tr. at 54-55). Ms. Kouljinski testified that on another occasion, when their daughter was five years old, their daughter disappeared while playing in a park. She stated that she received a phone call in which the caller claimed they had taken her daughter and that "[t]his time we took her only for two hours. Next time, it's going to be forever." J.A. at 137 (Hr'g Tr. at 70). No mention of either incident appeared in the application for asylum that Kouljinski filed in 2004, or in any earlier application or affidavit.

Kouljinski and his wife also both testified that the graves of his family members have been desecrated in recent years. In his asylum application, Kouljinski stated that he heard in 1998 that his father's gravestone was destroyed by anti-Semitic vandals. At his hearing, he also identified photographs sent to him by friends containing images of grave sites with non-Russian names that had been vandalized and "dirtied up." J.A. at 112-13 (Hr'g Tr. at 45-46). Ms. Kouljinski also identified photographs, which her mother's friends had taken, depicting vandalized grave sites, and she stated that the vandalism was "the work of a skinhead organization that exists in St. Petersburg, whose goal is to clear St. Petersburg from all non-Russians." J.A. at 139 (Hr'g Tr. at 72). Ms. Kouljinski also specifically identified photographs of vandalism to the headstones of Kouljinski's aunt and uncle, his niece, and his parents.

Kouljinski testified that since he has been in the United States, he has been convicted three times for driving under the influence of alcohol, in 1994, 1996, and 2001, all in the state of Michigan. J.A. at 409-28 (Michigan State Court Records). Kouljinski asserted that he had not drunk alcohol for three years and that he attends AA meetings when he is able. He also stated that he now has a restricted driver's license: his car must be equipped with a device to check his blood alcohol level before he can start the car, and he is permitted to drive only to and from work and to and from substance-abuse-support meetings. J.A. at 127-28 (Hr'g Tr. at 60-61), 248-51 (Order, Mich. Dep't of State, Driver License Appeal Div.).

Finally, both Kouljinski and the government submitted numerous documents for the IJ to consider, including reports from the U.S. Department of State and Amnesty International.

## C. The IJ's Decision

The IJ opened his decision by analyzing the testimony that Kouljinski and his wife gave at the hearing. The IJ expressed "concerns about the credibility of the testimony of [Kouljinski] and his wife." J.A. at 13-14. Although their testimony described their daughter being abducted, the IJ highlighted that Kouljinski's application for asylum did not mention these alleged traumatic events. While Ms. Kouljinski attributed the cause of their problems in Russia to his Jewish religion, Kouljinski spoke about racketeers' efforts to extort him and take over his business. The IJ also noted discrepancies between Ms. Kouljinski's testimony about her car accident and lawsuit and the documents that Kouljinski submitted with his asylum application. The IJ did find credible Kouljinski's testimony that he is Jewish and that he left Russia because he was subjected to extortion by racketeers in connection with his jewelry-manufacturing business.

The IJ next announced that he "would not be prepared to find on this record that [Kouljinski] was persecuted in Russia on account of his religion." J.A. at 17. Although Kouljinski mentioned various employment difficulties, the IJ stated that "these appear to have been related to his failure to obtain party membership" and those employment difficulties were not "sufficiently serious enough to rise to the level of persecution." *Id.* Further, those experiences occurred prior to the disintegration of the Soviet Union, and "there obviously have been significant changes in country conditions," particularly relating "to whether membership in the Communist Party would act as a barrier to employment" today. *Id.*

Although the IJ found that Kouljinski had not been persecuted in the past, in light of the testimony and the evidence in the record—particularly the Department of State 2003 Country Report on Human Rights Practices for Russia, J.A. at 18; *see also* J.A. at 494-531 (Dep't of State Report)—the IJ concluded that Kouljinski had demonstrated a well-founded fear of future persecution. J.A. at 18-19. Specifically, the IJ stated that

> given the fact that [Kouljinski] suffered some level of discrimination in the past based on the fact that he is Jewish and the fact that societal anti-Semitism appears to have survived the collapse of the Soviet Union and, unfortunately, that skinhead violence against Jews and other minorities is a persistent problem in Russia, [he] might well reasonably fear that he would be the target of such violence on return to Russia today.

J.A. at 19.

The IJ next discussed Kouljinski's three convictions in the United States for driving while under the influence of alcohol, noting that he had "very serious concerns in this case about whether . . . asylum should be granted as a matter of discretion." J.A. at 19. The IJ discussed each of the convictions and Kouljinski's efforts to attend substance-abuse counseling. The IJ also noted that Michigan had not fully restored Kouljinski's driving privileges and that Kouljinski's last conviction was a felony offense.

Before making his final determination as to whether to grant asylum to Kouljinski as a matter of discretion, the IJ next evaluated whether Kouljinski had demonstrated that he was entitled to withholding of removal under the INA or the CAT. Although the IJ concluded that Kouljinski "established a reasonable possibility of persecution," he found that Kouljinski had not demonstrated a likelihood of persecution—the standard for withholding of removal—for two reasons: First, because Kouljinski "was not, in my view, actually persecuted in the past," and second, because "the type of harm that [he] fears is not harm which is inflicted by the government" and is instead harm inflicted by non-state actors. J.A. at 22. The IJ stated that such harm is "likely to be somewhat more sporadic than persecution by government authorities." *Id.* The IJ next found that Kouljinski had not established a likelihood of being tortured on his return to Russia for similar reasons, explaining that Kouljinski did not complain of ever being tortured by government authorities and that his fear of persecution "relates again to action by non-state actors and not by the government." J.A. at 23.

At this point, the IJ returned to balancing the favorable and unfavorable factors regarding the exercise of discretion in Kouljinski's asylum application. The IJ explained that "the question is whether [Kouljinski's] eligibility for asylum is a sufficiently weighty favorable discretionary factor to outweigh the fact that [he] has three convictions for driving under the influence, the most recent conviction . . . a felony conviction for that offense." J.A. at 23. Noting the "repetitive" nature of Kouljinski's behavior as an adverse factor, the IJ concluded that "[i]n consideration of these factors, unfortunately, I have reached the conclusion that a favorable exercise of discretion in this case is unwarranted." J.A. at 23-24. Accordingly, the IJ ordered that Kouljinski's petition be denied and that he be removed from the United States to Russia.

## II. ANALYSIS

### A. Asylum

#### 1. Standard of Review

"The court reviews the factual determination of whether a petitioner qualifies as a refugee under a 'substantial evidence' test." *Gilaj v. Gonzales*, 408 F.3d 275, 283 (6th Cir. 2005). "The court may reverse the BIA's determination if the evidence 'not only supports a contrary conclusion, but indeed *compels* it.'" *Id.* (quoting *Ouda v. INS*, 324 F.3d 445, 451 (6th Cir. 2003)). Pursuant to 8 U.S.C. § 1252(b)(4)(D), "the Attorney General's discretionary judgment whether to grant relief under section 1158(a) . . . shall be conclusive unless manifestly contrary to the law and an abuse of discretion." "An abuse of discretion occurs when the BIA exercises its discretion in a way that is arbitrary, irrational, or contrary to law." *Gilaj*, 408 F.3d at 288. Because the BIA adopted the IJ's reasoning, we review the IJ's decision directly. *Id.* at 282-83.

#### 2. Analysis

"The disposition of an application for asylum involves a two-step inquiry: (1) whether the applicant qualifies as a 'refugee' as defined in 8 U.S.C. § 1101(a)(42)(A), and (2) whether the applicant 'merits a favorable exercise of discretion by the Attorney General.'" *Gilaj*, 408 F.3d at 283 (quoting *Perkovic v. INS*, 33 F.3d 615, 620 (6th Cir. 1994)). At the first step, an applicant for asylum may qualify as a refugee in either of two ways: (A) by establishing that he or she has suffered past persecution on the basis of race, religion, nationality, social group, or political opinion; or (B) by showing that he or she has a well-founded fear of persecution on one of those same bases. 8 C.F.R. § 1208.13(b).

Once an applicant demonstrates his or her eligibility for asylum by establishing refugee status, as Kouljinski did, the applicant progresses to the second step of the inquiry, at which point the BIA has stated that the applicant "has the burden of establishing that the favorable exercise of discretion is warranted." *In re Pula*, 19 I. & N. Dec. 467, 474 (B.I.A. 1987). The BIA has also stated that IJs should consider "the totality of the circumstances . . . in determining whether a favorable exercise of discretion is warranted," *id.* at 473, and that "[t]he danger of persecution will outweigh all but the most egregious adverse factors." *In re Kasinga*, 21 I. & N. Dec. 357, 367 (B.I.A. 1996).

Even though the IJ found that Kouljinski succeeded in establishing refugee status by showing a well-founded fear of future persecution, Kouljinski argues extensively in his brief that he is a refugee entitled to asylum because of *both* past persecution and fear of future persecution. *See* Brief for Petitioner ("Pet. Br.") at 17-26. Because both the IJ and the BIA agreed with Kouljinski that he established refugee status via the second route—by showing a reasonable possibility of future persecution—we proceed to the second step and analyze the IJ's discretionary denial of Kouljinski's application for asylum.[1]

Kouljinski argues that the IJ abused his discretion in denying him asylum for two reasons. First, Kouljinski contends that "drunk driving convictions, which are not even crimes involving moral turpitude, should not be a factor to negate the grant of asylum." Pet. Br. at 28. In his brief, Kouljinski provides absolutely no citations or support for his assertions that only crimes involving

---

[1] We will return to Kouljinski's evidentiary arguments insofar as they relate to his claims that he met the standards required for mandatory relief under the INA and the CAT.

moral turpitude may be the basis for a discretionary denial of asylum.[2]  In fact, several cases appear to rely on such lesser crimes in affirming the exercise of discretion by immigration judges.  *See Barrie v. Gonzales*, 228 F. App'x 66, 69 (2d Cir. 2007) (denying petition where IJ based her discretionary denial on applicant's multiple convictions for counterfeiting and disorderly conduct); *Huang v. INS*, 436 F.3d 89, 98 (2d Cir. 2006) (stating that "[a]dverse factors include criminal convictions, as well as significant violations of national immigration laws and the manner of entry into this country"); *Kazlauskas v. INS*, 46 F.3d 902, 906-07 (9th Cir. 1995) (holding that "the IJ permissibly found asylum unwarranted as a matter of discretion" where the IJ considered the applicant's "criminal record since he has been in this country"); *Dhine v. Slattery*, 3 F.3d 613, 619 (2d Cir. 1993) ("Seven convictions over seven years—even seven misdemeanors—easily furnish a rational basis for the Attorney General's exercise of discretion."); *Purveegiin v. U.S. INS Processing Ctr.*, 73 F. Supp. 2d 411, 418-19 (S.D.N.Y. 1999) (stating that the "INS may consider petitioner's criminal history in determining whether he is eligible for asylum" and concluding that six misdemeanor convictions over four years furnished rational basis for the exercise of discretion); *cf. Ajanel v. Ashcroft*, 120 F. App'x 729, 732 (9th Cir. 2005) (denying petition, in context of motion to remand for adjustment of status, where the IJ held that applicant did not merit "favorable exercise of discretion because his [single] drunk driving conviction outweighed his recent marriage to a [U.S.] citizen[] and the fact that their child was a [U.S.] citizen").

The BIA has stated that IJs should consider "the totality of the circumstances . . . in determining whether a favorable exercise of discretion is warranted," *In re Pula*, 19 I. & N. Dec. at 473, and Kouljinski points to nothing in the INA, relevant regulations, or BIA case law that precludes consideration of convictions for driving under the influence of alcohol.  Indeed, governing law provides for a *mandatory* denial of an alien's application for asylum if the alien has "been convicted by a final judgment of a particularly serious crime [and] constitutes a danger to the community of the United States."  8 U.S.C. § 1158 (b)(2)(A)(ii); *see also* 8 C.F.R. 1208.13(c)(2)(i).  Given that the BIA has held that "[f]actors which fall short of the grounds of mandatory denial may constitute discretionary considerations," *In re H–*, 21 I. & N. Dec. 337, 347 (B.I.A. 1996), we need not determine whether driving under the influence of alcohol is a "particularly serious crime"—which would *require* the denial of Kouljinski's application—to hold that the IJ properly considered Kouljinski's three convictions of that offense in denying his application as a matter of discretion.

In light of this case law and our view that an IJ may properly consider an alien's convictions for an offense like driving while under the influence of alcohol, regardless of whether it is a crime of moral turpitude or a particularly serious crime, we hold that the IJ did not abuse his discretion in

---

[2] At oral argument, counsel for Kouljinski referenced the U.S. Department of State Foreign Affairs Manual in arguing that the IJ should not have considered Kouljinski's drunk-driving convictions because they occurred more than three years before the hearing.  The cited section, however, pertains not to asylum applications but to visas.  *See* 9 F.A.M. 40.11 N9.5, *available at* http://www.state.gov/documents/organization/86936.pdf.  Further, the section discusses the effect of evidence of substance abuse in visa applications, and, far from barring evidence of substance abuse, the manual provides that an alien in remission—which is not something that Kouljinski established—"is not ineligible to receive a visa."  9 F.A.M. 40.11 N9.4.  Thus, even the sole source to which Kouljinski points does not bar this evidence and would seem to permit consideration of drunk-driving convictions.

In addition, the manual elsewhere states that an applicant is ineligible for a visa if the applicant "[h]as a physical or mental disorder with associated harmful behavior."  9 F.A.M. 40.11 N8.  The manual further explains that

> [w]hile alcoholism constitutes a medical condition . . . [a]n alcoholic is *not* ineligible to receive a visa *unless* there is current[,] or a history of, harmful behavior associated with the disorder that has posed or is likely to pose a threat to the property, safety, or welfare of the alien or others.  For example, . . . a conviction for driving while under the influence of alcohol would constitute evidence of a medical disorder with associated harmful behavior.

9 F.A.M. 40.11 N8.3.  According to the Foreign Affairs Manual, Kouljinski appears ineligible for a visa based on his three convictions for driving under the influence.

this case by basing his discretionary denial of asylum on Kouljinski's three drunk-driving convictions.

Kouljinski's second argument that the IJ abused his discretion concerns the IJ's statement that Kouljinski "does not have family ties in the United States to individuals who are legally present in this country." J.A. at 23. Kouljinski contends that the IJ erred in ignoring his daughter and his wife, who testified at his hearing, Pet. Br. at 28, but BIA case law belies this argument. *In re Pula*, the case that Kouljinski cites regarding the factors that an IJ should consider in exercising discretion, states that "whether the alien has relatives *legally* in the United States . . . is another factor to consider." *In re Pula*, 19 I. & N. Dec. at 474 (emphasis added). Kouljinski does not rely on the presence of any relatives legally in the United States, as he only mentions his wife and daughter, who were not legally present. The IJ therefore did not abuse his discretion balancing the factors without considering Kouljinski's wife and daughter.

In sum, Kouljinski has not demonstrated that the IJ abused his discretion in denying Kouljinski's application for asylum.

## B. Withholding of Removal under the INA and the CAT

### 1. Standard of Review

To prevail on a petition for withholding of removal under the INA, or on a petition for withholding of removal under the CAT, an alien must show that there is a "clear probability" that she would be subject to persecution, for the INA, or to torture, for the CAT, on the basis of one of the five statutorily protected grounds were she removed from this country. *Almuhtaseb v. Gonzales*, 453 F.3d 743, 749 (6th Cir. 2006). This showing of "clear probability" requires more than that needed to demonstrate refugee status, which requires only a "well-founded fear of persecution." 8 C.F.R. § 208.13(b). *See also Mikhailevitch v. INS*, 146 F.3d 384, 391 (6th Cir. 1998) ("An application seeking withholding of deportation faces a more stringent burden of proof than one for asylum."). Further, "administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B).

### 2. Analysis

Kouljinski contends that the IJ erred in finding that Kouljinski failed to meet the showing required for withholding of removal under the INA because "the country condition reports alone support Mr. Kouljinski's claims that as a Russian Jew, he faces persecution, detention, torture and possibly even death at the hands of anti-Jewish Russians." Pet. Br. at 30. The IJ, however, recognized that such anti-Semitic violence was possible, but concluded that such violence was not likely and relied on the same State Department country conditions report that Kouljinski claims demonstrates his entitlement to relief. J.A. at 18, 22-23. The IJ "noted that Jewish leaders have stated publicly that state-sponsored anti-Semitism of the Soviet era no longer existed." J.A. at 18. The IJ also stated that although "Jews continued to face prejudice, social discrimination and some acts of violence," because non-state actors are the source of such harms, "such occurrences are . . . likely to be somewhat more sporadic than persecution by government authorities." J.A. at 18, 22. The IJ and Kouljinski examined the same evidence, the IJ reached a reasonable conclusion, and Kouljinski does not point to any evidence that compels the opposite conclusion.

Kouljinski argues that the IJ erred in denying his claim for relief under the CAT because the IJ incorrectly focused on Kouljinski's subjective fears. *See* Pet. Br. at 33 (citing *Camara v. Ashcroft*, 378 F.3d 361 (4th Cir. 2004)). Although the IJ did state his belief that Kouljinski's "fear of persecution, in my view, relates again to action by non-state actors and not by the government," the IJ also supported his decision to deny relief under the CAT by noting that Kouljinski "does not complain that he was ever tortured or really in any way physically mistreated by government

authorities during the time he lived in the Soviet Union or Russia previously." J.A. at 23. That consideration appears as a factor designated for examination in the relevant regulation. *See* 8 C.F.R. § 208.16(c)(3)(i).

Kouljinski also argues that the IJ erred in denying his claim for relief under the CAT because the record shows that the "Russian government does not investigate nor prosecute these claims [of torture], thus showing their acquiescence in the abuse, torture and murder of Jews in Russia." Pet. Br. at 34. Kouljinski is correct that a government's "acquiescence" in the torture of a group *could* support relief under the CAT. *See* 8 C.F.R. § 1208.18(a)(1) (defining torture as including severe pain or suffering "inflicted by or . . . with the consent or acquiescence of a public official or other person acting in an official capacity"). The IJ, however, observed that the State Department report noted that governmental "[a]uthorities often provided strong words of condemnation" to acts of violence against Jews. J.A. at 19. That report also notes that Russian police have successfully defused bombs wired to anti-Semitic signs. J.A. at 512 (State Dep't Report). As the Second Circuit concluded in *Wang v. Ashcroft*, "while [the asylum applicant's] testimony as well as some of his 'country conditions' documents . . . indicate that some prisoners in China have been tortured, [he] has in no way established that someone in his particular alleged circumstances is *more likely than not* to be tortured if imprisoned in China." *Wang v. Ashcroft*, 320 F.3d 130, 144 (2d Cir. 2003). Likewise, given that the very documents on which he relies demonstrate that the Russian government has condemned and worked to stop acts of persecution and violence against Jews, Kouljinski has not demonstrated that the record compels the conclusion that it is more likely than not that he would be subjected to torture in Russia by public officials or with the consent or acquiescence of the Russian government.

## III. CONCLUSION

Because we hold that an IJ may properly consider an alien's convictions for driving under the influence of alcohol in making a discretionary denial of asylum, and because Kouljinski has failed to show that he is "more likely than not" to face persecution or torture were he to return to Russia, we **DENY** Kouljinski's petition for review of the BIA's decision to deny his application for asylum and withholding of removal.