**Djusta GJOKIC and Gjoka Juncaj, Petitioners,**

v.

**John ASHCROFT, Attorney General of the United States, Respondent.**

Nos. 02–3915, 02–3917.

United States Court of Appeals, Sixth Circuit.

June 29, 2004.

Richard A. Kulics, Birmingham, MI, for Petitioners.

James A. Hunolt, Linda S. Wernery, Allen W. Hausman, U.S. Department of Justice, Office of Immigration Litigation, Washington, DC, for Respondent.

Before MARTIN and SUTTON, Circuit Judges; and HOLSCHUH, District Judge.*

Petitioners—Gjoka Juncaj and his wife, Djusta Gjokic—seek review of a Board of Immigration Appeals order denying their asylum claim. We deny the petition.

## I.

Gjoka Juncaj and his wife, Djusta Gjokic, entered the United States as non-immigrant visitors in September 1991. Mr. Juncaj then requested asylum, alleging in his application that, as an ethnic-Albanian living in what was then known as Yugoslavia, he faced persecution. More specifically, he stated: (1) that he "attended several demonstrations to protest [the] treatment of Albanians by the Serbian dominated government" and that he "was detained and interrogated because [he] attended those demonstrations"; (2) that in 1991 he was conscripted into the Yugoslav army but "escape[d] to the United States" before he was due to report; and (3) that "[i]f [he] were forced to return to Yugoslavia" he "would be imprisoned or shot." JA 147.

In September 1998, a consolidated deportation hearing was held for Mr. Juncaj and Ms. Gjokic. Ms. Gjokic's asylum application was derivative of her husband's.

At the hearing Mr. Juncaj testified that he lived in Montenegro, which was then a part of the nation of Yugoslavia, which later became part of the Federal Republic of Yugoslavia, and which today is part of the loose federation known as Serbia and Montenegro. While living in Montenegro. Mr. Juncaj attended seven or eight demonstrations against the then-Serbian-dominated government to protest its treatment of Albanians. Approximately 5,000–6,000 Albanians attended each demonstration. After one of the demonstrations, the police detained Juncaj and other demonstrators for several days. Although Mr. Juncaj did not mention any physical abuse or harm in his written application, he testified at the hearing that during his detention the police beat him and other demonstrators with rubber sticks and that he suffered bruising as a result. Mr. Juncaj did not seek medical attention after he was released; in his words, "[s]omething like that wasn't [ ] allowed." JA 89.

Mr. Juncaj also testified that he served for 11 months in the Yugoslav army in the mid–1980's, but that when he was called into the reserves in 1991 to fight against the Croats, he and his wife fled to the United States. According to Mr. Juncaj, no one from Montenegro responded to the notices to serve. Some five or six months after he fled the country, Serbian forces arrived at Mr. Juncaj's house and requested his uniform, which (according to Mr. Juncaj) signaled that the government would imprison him if he returned.

---

* The Honorable John D. Holschuh, United States District Judge for the Southern District of Ohio, sitting by designation.

While Mr. Juncaj acknowledged that Yugoslavia granted amnesty to citizens like himself who evaded conscription between 1991 and 1995, Mr. Juncaj still believed the government would harm him if he returned. According to Mr. Juncaj, his brother also was part of the group promised amnesty for avoiding conscription between 1991 and 1995, but that the government nonetheless took his brother's passport and identification card and released him from his job.

The INS also presented evidence at Mr. Juncaj's hearing. The INS introduced into the record an opinion by the Department of State Office of Asylum Affairs regarding Mr. Juncaj's claim. The opinion states that "[t]he situation in Montenegro ... is relatively benign for ethnic Albanians." Letter from William M. Bartlett, Director, Office of Asylum Affairs, U.S. Department of State to Executive Office of Immigration Review (Aug. 20, 1998). "Indeed," the opinion continued, "the governing coalition represents the ethnic Albanian community." *Id.* While noting Mr. Juncaj's claim that the Montenegrin government would harm him for evading military service despite the general amnesty, the Department of State "discern[ed][no] basis on which [Mr. Juncaj] can plausibly maintain that he would face mistreatment on return to Montenegro." *Id.*

The record also includes the State Department's "Country Reports on Human Rights Practices for 1997, a Profile of Asylum Claims and Country Conditions for Serbia/Montenegro," dated April 1997, along with an addendum to the Profile written in April 1998. According to the 1997 report, human rights abuses in Montenegro did not rise to the level of abuse found in Kosovo, where Serbian forces brutally repressed Albanians. The Profile notes that while Yugoslavia requires military service for 18–year–old men, ethnic

Albanians were rarely recruited because the military did not want to arm minorities. More importantly, notes the Profile, Yugoslavia granted amnesty to those who avoided military service between 1991 and 1995. The Profile also indicates, however, that, according to the Humanitarian Law Center, many ethnic Albanians returning from Germany upon being promised amnesty for draft evasion still faced harassment ranging from confiscation of identity cards to physical abuse and imprisonment.

The 1998 addendum to the State Department Profile paints a somewhat brighter political picture for Montenegro (if not a brighter economic picture). While Serbian police forces brutally repressed Albanians in Kosovo in 1998, the treatment of Albanians in Montenegro was "relatively benign." JA 107. "Montenegrin applicants [for asylum]," the State Department concludes, "can reasonably be expected to demonstrate exceptional circumstances for any claim that they are targeted by the authorities," noting that it is "the desperate economic situation in Montenegro" that "ensure[s] a high level of emigration" more so than political or ethnic persecution. *Id.*

The immigration judge issued an oral opinion denying petitioners' asylum claims. The judge first concluded that Mr. Juncaj had not suffered past persecution. While the judge did not question Mr. Juncaj's credibility, the judge found that "[i]n the context of the demonstration" that Mr. Juncaj attended, the one occasion in 1989 when Mr. Juncaj was detained, beaten and bruised did not amount to persecution, JA 53, "nor would there be any inclination on the part of the government to ... persecute [Mr. Juncaj] on account of having demonstrated in 1989" should he return, JA 54–55.

The immigration judge also determined that Mr. Juncaj did not have a well-founded fear of future persecution. The judge

found that the general amnesty for draft evaders declared by the Yugoslav parliament in 1996 applied to Mr. Juncaj. And while the judge acknowledged Mr. Juncaj's testimony that some of his relatives were punished for avoiding military service between 1991 and 1995. the judge found the testimony to be uncorroborated and vague. JA 55.

On July 18, 2002, the Board of Immigration Appeals affirmed (without an opinion) the immigration judge's decision denying Mr. Juncaj's and Ms. Gjokic's asylum claims. If the Board's order is upheld, the Government "will first seek to deport Petitioners to their claimed country of nationality, Montenegro, in accordance with 8 U.S.C. § 1231(b)(2000)." *See* Letter from Linda S. Wernery, Senior Litigation Counsel, Office of Immigration Litigation to Leonard Green, Clerk, U.S. Court of Appeals for the Sixth Circuit (June 15, 2004).

## II.

■ Petitioners first challenge the Board's summary-affirmance procedure, arguing that it violates due process for a single Board member summarily to affirm an immigration judge's opinion. Our recent decision in *Denko v. INS*, 351 F.3d 717 (6th Cir.2003), disposes of this challenge.

Joining every circuit that has addressed the question. *Denko* holds that the Board's summary-affirmance procedure does not violate due process. *Id.* at 729–30 (citing cases); *see, e.g., Blanco de Belbruno v. Ashcroft*, 362 F.3d 272, 280–83 (4th Cir.2004); *Zhang v. United States Dep't of Justice*, 362 F.3d 155, 156–59 (2d Cir.2004). "Even if the [Board] would view the factual and legal issues differently from the immigration judge," we explained, "the summary-affirmance-without-opinion rule renders the [immigration judge's] decision the final agency order,

and we review that decision." *Denko*, 351 F.3d at 730. As a result, aliens like Mr. Juncaj and his wife who receive an unfavorable decision from an immigration judge and who receive a summary affirmance from the Board still "receive[ ] full and fair review," which is all that due process requires under these circumstances. *Id.* (quotation omitted).

## III.

■ Petitioners separately challenge the merits of the immigration judge's asylum decision. Under the Immigration and Nationality Act, as amended, asylum-seekers like Mr. Juncaj and his wife must first prove that they were "refugee[s]." 8 U.S.C. § 1158(b). The Act defines "refugee" as a person "who is unable or unwilling to return to" his or her country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.* § 1101(a)(42)(A).

The Act offers two ways to meet this definition. First, an applicant may prove that "he or she has suffered *past* persecution," 8 C.F.R. § 208.13(b) (emphasis added), which if successfully established creates a rebuttable presumption that the applicant has a well-founded fear of *future* persecution, 8 C.F.R. § 208.13(b)(1). The Government may overcome this presumption by showing that conditions in the applicant's native country have changed so "that the applicant no longer has a well-founded fear of persecution." *Id.* § 208.13(b)(1)(i)(A). Second, and more directly, an applicant may prove that "he or she has a well-founded fear of future persecution." 8 C.F.R. § 208.13(b).

We review the immigration judge's determination under the deferential "substantial evidence" standard. The immi-

gration judge's determination whether petitioners were persecuted and whether they have a well-founded fear of future persecution must be upheld "unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *see Yu v. Ashcroft*, 364 F.3d 700, 702 (6th Cir.2004) ("[Section] 1252(b)(4)(B) basically codifies the Supreme Court's substantial evidence standard."); *see also INS v. Elias–Zacarias*, 502 U.S. 478, 483–84, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992) (a court must uphold the Board's determination unless the evidence presented was "so compelling that no reasonable factfinder could fail to find the requisite ... persecution"); *Mikhailevitch v. INS*, 146 F.3d 384, 388 (6th Cir.1998) ("Under this deferential standard, we may not reverse the Board's determination simply because we would have decided the matter differently."); *Klawitter v. INS*, 970 F.2d 149, 151–52 (6th Cir.1992) ("Substantial evidence is [ ] a deferential standard which plainly does not entitle a reviewing court to reverse ... simply because it is convinced that it would have decided the case differently.") (quotation omitted); *see also Denko v. INS*, 351 F.3d 717 (6th Cir.2003) ("When the Board adopts the decision of the [immigration judge] in lieu of issuing its own opinion, we review the [immigration judge's] decision as the final agency decision.").

Measured against these criteria, Mr. Juncaj's challenge to the immigration judge's decision falls short. Petitioners' strongest evidence of past persecution is Mr. Juncaj's testimony that on one occasion in 1989 officials detained and beat him after a demonstration. Mr. Juncaj testified that he suffered bruising as a result, but that he sustained no permanent injuries and sought no medical assistance. While the immigration judge believed Mr. Juncaj's testimony and while even a single

beating offends one's sense of civilized governmental conduct, a single beating does not *compel* a finding of persecution, which is the inquiry here. *See Dandan v. Ashcroft*, 339 F.3d 567, 574 (7th Cir.2003) (holding that being detained, beaten and deprived of food for three days did not compel a finding of persecution); *Prasad v. INS*, 47 F.3d 336, 339–40 (9th Cir.1995) (holding that, "[a]lthough a reasonable factfinder *could* have found" a brief detention and beating requiring no medical care "sufficient to establish past persecution ... a factfinder would [not] be compelled to do so"); *Kapcia v. INS*, 944 F.2d 702, 704, 707 (10th Cir.1991) (holding that being "detained for a two-day period [and] ... interrogated and beaten" did not compel a finding of past persecution); *Skalak v. INS*, 944 F.2d 364, 365 (7th Cir.1991) ("The function [of the past-persecution inquiry] is to identify persecution so severe that perhaps a person should not be forced to return to the country in which she underwent it even if the danger of recurrence is negligible."); *cf. Mikhailevitch*, 146 F.3d at 390 (stating that something "more than a few isolated incidents of verbal harassment or intimidation unaccompanied by any physical punishment" is *necessary* for finding persecution, but nowhere suggesting that physical punishment is in all cases *sufficient* for finding persecution).

In rejecting Mr. Juncaj's claim of past persecution, the immigration judge not only considered the length of the detention (two to three days) and severity of the physical harm (bruising), the judge also properly considered "the context of the demonstration" that Mr. Juncaj attended. As Mr. Juncaj himself testified, he did not lead any demonstrations, he did not speak at any demonstrations, he did not distinguish himself from the several thousand other demonstrators, and he was never detained or beaten again in the one and a

half years between the incident underlying his past-persecution claim and his leaving Montenegro. These circumstances would not compel a reasonable factfinder to find that governmental officials persecuted Mr. Juncaj.

Nor, on this record, can we say that the evidence compelled the immigration judge to determine that petitioners have a well-founded fear of future persecution. If Mr. Juncaj were to return to Montenegro, they claim that the government would imprison Mr. Juncaj or shoot him for avoiding conscription in 1991. As we have held in other cases, however, "this fear is not objectively reasonable because the government of Serbia and Montenegro granted amnesty to such evaders." *Vuljaj v. INS,* 77 Fed. Appx. 793, 799 (6th Cir. Sept.16, 2003); *see Marasevic v. INS,* 86 Fed.Appx. 817, 819 (6th Cir. Dec.15, 2003) (upholding denial of asylum to an ethnic-Albanian native of Montenegro in part because "mistreatment based on an applicant's resistance to legitimate military service is generally insufficient to support an asylum claim"); *see also Capric v. Ashcroft,* 355 F.3d 1075, 1094 (7th Cir.2004) (holding that "the evidence does not compel a finding" that an ethnic-Albanian from Montenegro has "a well-founded fear of persecution due to his refusal to serve in the military").

According to the State Department, ethnic Albanians are treated relatively well in Montenegro, and the evidence thus does not compel an immigration judge to conclude that petitioners have a well-founded fear of returning there. *See* Letter from William M. Bartlett, Director, Office of Asylum Affairs, U.S. Department of State to Executive Office of Immigration Review (Aug. 20, 1998) ("The situation in Montenegro ... is relatively benign for ethnic Albanians. Indeed, the governing coalition represents the ethnic Albanian community.... We do not discern a basis on which the applicant can plausibly maintain that he would face mistreatment on return to Montenegro."); *see also Micakovic v. Ashcroft,* 85 Fed.Appx. 424 (6th Cir.2003) (upholding denial of asylum to an ethnic-Albanian native of Montenegro in part because, "according to the State Department Country Report, ethnic Albanians were treated well in Montenegro").

## IV.

For the foregoing reasons, we deny the petition for review.