NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0675n.06
Filed: August 8, 2005

No. 03-4422

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | |
|---|---|
| TANUSH JAKU, et al., ) | |
| ) | **ON PETITION FOR REVIEW** |
| *Petitioners-Appellants*, ) | **OF AN ORDER OF THE** |
| ) | **BOARD OF IMMIGRATION** |
| v. ) | **APPEALS** |
| ) | |
| ALBERTO GONZALES,* Attorney ) | **OPINION** |
| General of the United States, ) | |
| ) | |
| *Respondent-Appellee.* ) | |

BEFORE: NORRIS and BATCHELDER, Circuit Judges; MILLS, District Judge.**

**RICHARD MILLS, District Judge.**

Lead Petitioner Tanush Jaku ("Jaku"), his wife, Lajde Jaku ("Mrs. Jaku"), and their three sons, Beshmir, Delin, and Endrin, who are all natives and citizens of Albania, seek review of the final order of removal issued by the Board of Immigration

---

*Alberto Gonzales is substituted for his predecessor, John Ashcroft, as Attorney General of the United States, pursuant to Fed. R. App. P.R. 43(c)(2).

**The Honorable Richard Mills, United States District Judge for the Central District of Illinois, sitting by designation.

Appeals ("BIA"). The BIA affirmed the oral decision of the immigration judge denying Jaku's applications for asylum and withholding of removal and protection under the Convention Against Torture. Jaku argues that the findings of the immigration judge and the decisions reached by the immigration judge and the BIA are not supported by substantial evidence and are therefore not entitled to be viewed as conclusive. The petition for review is **DENIED**.

## I. FACTUAL BACKGROUND

The Petitioners entered the United States on June 25, 2001 without the benefit of a valid visa. On October 27, 2001, Jaku submitted his first application for asylum, which included his marriage certificate, birth certificate, and two photos showing a collapsed structure. In the application, Jaku states that in 1991 a gang of unknown masked men beat him because he was the chairman of his local Democratic Party, an opposition party in Albania. Jaku was warned of trouble if he and his family did not change their beliefs. Jaku also alleges that members of the Socialist Party threatened him in the form of phone calls, letters, and messengers in an effort to discourage his participation in the Democratic Party. He was told by a friend who was a secret police officer that he would be executed. In response, Jaku fled to Greece but returned after an unknown man "violated" one of his sons at a school picnic and warned the boy that bad things would happen to opponents of the regime. Jaku states that an unknown

2

person bombed his house in April 2001 but that no one was injured. The following month, Jaku and his family left Albania.

On February 28, 2002, Jaku submitted a second application alleging that he and his family were persecuted in Albania due to their "political beliefs." He alleged that he had been beaten, his son had been molested, and his house had been bombed. Attached to the application was a letter from a local police chief which corroborated Jaku's allegation that his house had been destroyed by a bomb. The letter indicated that the police had been unable to determine who was responsible for the damage to Jaku's house.

On May 21, 2002, Jaku testified before the immigration judge about his application for relief from removal. Jaku, a professional truck driver, testified that he had been active in the Democratic Party since 1990. He served as chairman of the party in his village. In 1992, the Democratic Party unseated the ruling Labor Party (socialists) and retained power until 1997. Jaku stated that he received threats because of his position within the party. He testified that "unknown people" threatened him because of his involvement with the Democratic Party and beat him up one night while he was walking home from a meeting. The threats intensified after the Labor Party ascended to power in 1997. Jaku states that he fled to Greece in October 2000 after a friend in the secret police told him that government agents planned to kill him

in retaliation for his involvement with the Democratic Party.

According to his testimony, Jaku returned to Albania in April 2001 after someone threatened his son at a school function. The unknown assailant warned his son that Jaku should not participate in the Democratic Party. Later that month, a building on his land was severely damaged in a blast. Jaku testified that following this incident, he and his family went to Greece where they stayed for a couple of months. He stated they eventually entered the United States through Canada.

On cross-examination, the Government asked Jaku why he could produce no letters confirming his membership in the Democratic Party. Despite the fact that he was able to obtain a letter from the village police chief, a Labor Party member, Jaku testified that he had no friends who could send a letter confirming his membership in the Democratic Party. He stated that he had disturbed his friends "too much." Jaku did produce a Democratic Party membership card, which was dated June 30, 1994.

Jaku further testified that the "pressures" were much worse from 1997-2000 than they had been between 1992-1997. He stated that during the 1997 elections, he and other Democratic Party members were forced to give up what apparently were ballot boxes, which were then confiscated by the police. When asked why he did not report this incident on his application, Jaku testified that he was in shock and that he recalls these events in "bits and pieces." Jaku also had difficulty answering how he

4

was able to obtain the letter from the chief of police, who belonged to the Labor Party. There were also some inconsistencies regarding the incident with Jaku's son. When asked if his son's assailant touched the boy, Jaku responded that they grabbed his wrists and threatened him, but did not initially say that the boy was molested, as he alleged in his application. When pressed on the omission, Jaku blamed the interpreter.

Mrs. Jaku testified that her husband was the chairman of the Democratic Party. She also stated that because of her husband's political affiliation, they received threats and weapons were discharged near their home. Mrs. Jaku also testified that her son was threatened and molested while attending the school picnic. Following Mrs. Jaku's testimony, the immigration judge recalled Jaku in order to ask him if he was aware that people were discharging weapons near the Jaku's home. He stated that he was aware of those incidents. When asked why he did not mention the shootings in his application or testimony, Jaku responded that he could not list all instances of persecution in his application.

The immigration judge denied Jaku's applications for asylum and withholding of removal. This decision was based in part on the inconsistencies between the testimony at the hearing and the information contained in the application for asylum. Specifically, the application contained neither the alleged shootings nor the threats that he received while the Democratic Party was in power. Jaku was unable to provide

a legitimate explanation for these omissions. The immigration judge was not persuaded by Jaku's explanation that he could not recall every detail due to the shock that he endured. Because of these inconsistencies and the lack of corroboration, the immigration judge determined that the Petitioners failed to establish eligibility for asylum or withholding of removal. The immigration judge also held that Jaku was "ineligible for withholding of removal under the Convention Against Torture because he has not proven more likely than not that he would be tortured if forced to return to Albania." The BIA affirmed on the basis of the immigration judge's decision.

## II. ANALYSIS

In order for asylum to be granted, Jaku has the burden of establishing that he was persecuted, or that he has a well-founded fear of future persecution in Albania, "on account of . . . membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). "A well-founded fear must be both subjectively genuine and objectively reasonable." Daneshvar v. Ashcroft, 355 F.3d 615, 623 (6th Cir. 2004). To establish the right to withholding of removal to Albania under 8 U.S.C. § 1231(b)(3), Jaku has the burden of establishing past persecution on account of political opinion or that it is "more likely than not" that he would be persecuted in Albania in the future "on account of . . . membership in a particular social group, or political opinion." See Castellano-Chacon v. INS, 341 F.3d 533, 545 (6th Cir. 2003);

8 C.F.R. § 208.16(b)(1). In determining eligibility for asylum and withholding, courts examine the same factors. However, a higher probability as to the likelihood of persecution is required to establish the right to withholding of removal. See id.

Because the BIA summarily affirmed the decision of the immigration judge, we directly review the decision of the immigration judge. See Denko v. INS, 351 F.3d 717, 730 (6th Cir. 2003). Because it is often difficult for an alien to obtain documentary or corroborative evidence in support of his claims, we have held that an alien's own testimony can alone be sufficient to support an application for asylum "where the testimony is believable, consistent, and sufficiently detailed to provide a plausible and coherent account of the basis for his fear." Perkovic v. INS, 33 F.3d 615, 621 (6th Cir. 1994) (internal quotation omitted). Our review of the immigration judge's factual findings is limited, for the determination whether Jaku was persecuted or has a well-founded fear of persecution must be upheld "unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). This language basically codifies the Supreme Court's "substantial evidence" standard, as discussed in INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992).[1]

---

[1] In Elias-Zacarias, the Supreme Court was interpreting the language in the since-repealed 8 U.S.C. § 1105a(a)(4), which was the predecessor to § 1252(b)(4)(B). See Yu, 364 F.3d at 702. The Court noted that the statute provided that the BIA's determination that an alien was not eligible for asylum must be upheld if "supported by reasonable, substantial, and probative evidence on the record considered as a whole." Elias-Zacarias, 502 U.S. at 481 (quoting 8 U.S.C. § 1105a(a)(4)).

7

See Yu v. Ashcroft, 364 F.3d 700, 702 (6th Cir. 2004).

We have recognized that a single incident may be sufficient to establish past persecution. See Gilaj v. Gonzalez, 408 F.3d 275, 285 (6th Cir. 2005). The Court in Gilaj further noted:

> [T]he critical factor is the overall context in which the harmful conduct occurred. It is not sufficient that the applicant has been subjected to indiscriminate abuse, such as physical force or violence employed against a crowd of demonstrators, or has been the victim of a random crime. Instead, the applicant must establish that he or she was specifically targeted by the government for abuse based on one of the statutorily protected grounds. If the applicant can make this showing, then the court should consider whether the applicant was subjected to physical harm and suffering or simply verbal threats and intimidation, and the gravity of the circumstances presented.

Id.

We conclude that the immigration judge's determination that Jaku did not prove a well-founded fear of persecution is supported by substantial evidence. During the hearing Jaku testified to events of alleged persecution that he did not mention in his application for asylum, including the shootings that took place outside of his house and his encounter with the police at the voting station. Additionally, Jaku did not provide a satisfactory explanation about how he was able to obtain a letter from a Labor Party police chief but was unable to obtain documentary evidence of his position in the Democratic Party.

The bombing of Jaku's house does not establish a well-founded fear of persecution. Jaku must prove that he was persecuted "on account of . . . membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). The record is silent with regard to who bombed the house or why the house was bombed. The immigration judge noted the following: (1) Jaku did not testify that he knew who was responsible for the bombing; (2) the letter that he obtained from the police chief stated that the police did not know who was responsible; and (3) Jaku's application does not indicate that he knew who was responsible. Accordingly, the immigration judge was unable to find that the bombing of Jaku's house supported the claim for asylum. We conclude this determination is supported by substantial evidence.

That an unknown person battered and threatened Jaku's son does not compel the conclusion that the immigration judge erred. We have found that "persecution," pursuant to 8 U.S.C. § 1101(a)(42)(A), "requires more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty." Mikhailevitch v. INS, 146 F.3d 384, 390 (6th Cir. 1998). However, we have also noted that Mikhailevitch has not been interpreted as "suggesting that physical punishment is in all cases *sufficient* for finding persecution." Gjokic v. Ashcroft, 104 Fed.Appx. 501, 505 (6th Cir. 2004) (citing Mikhailevitch, 146 F.3d at 390). It follows that "while even a single beating

9

offends one's sense of civilized governmental conduct, a single beating does not *compel* a finding of persecution." Id. (citations omitted). The key inquiry involves "the overall context in which the harmful conduct occurred." Gilaj, 408 F.3d at 285. While the details of the battery of Jaku's son are unclear, there is no question that it was a "despicable action," as noted by the immigration judge. However, it appears that was an isolated incident and not part of a systematic pattern. We conclude that incident does not rise to the level of persecution.

The immigration judge found several problems with Jaku's testimony. Specifically, his claim was weakened by the lack of any corroboration of his Democratic Party activities over the years. Moreover, the Jakus were vague and imprecise when discussing the threats that they allegedly received. Because of these findings, and because of the problems noted above as to the other incidents, the immigration judge determined that Jaku did not establish past persecution or a well-founded fear of future persecution. Accordingly, the immigration judge determined that Jaku did not establish eligibility for asylum or withholding of removal. We conclude this finding is supported by substantial evidence.

We note that a panel of this Court recently reviewed a BIA decision denying an Albanian husband and wife's requests for asylum, withholding of removal, and protection under the Convention Against Torture. See Gilaj, 408 F.3d at 279. The

facts of that case are somewhat similar to the facts of the case <u>sub</u> <u>judice</u>. Prior to coming to the United States in 2000, Mrs. Gilaj was active in the Democratic Party in Albania. She actively campaigned for Democratic Party candidates prior to the June 1997 election. During that period, Mr. and Mrs. Gilaj and their son were threatened by the police. Additionally, her husband was wounded in the neck with a knife on election day in a confrontation with the Socialists. <u>See</u> <u>id.</u> at 279-80.

Following the June 1997 election, Mrs. Gilaj remained active in politics. In September 1998, the police searched her home for weapons. During the search, Mrs. Gilaj was beaten but suffered no serious injury. The police informed her that they did not need a search warrant and that they could enter the house by force because they were Socialists who were going to make all of the Democrats suffer. Her son was then arrested, sent to jail for two days, and beaten. <u>See</u> <u>id.</u> at 280.

Another incident occurred in April 2000. Mrs. Gilaj was a co-organizer of an anti-government protest. She hoped to increase attendance at the demonstration by encouraging women who lived in her village to attend. Mrs. Gilaj spoke at the demonstration. While no one was arrested at the demonstration, she and her family received phone calls that night from unidentified individuals threatening that the family would pay dearly for the speech. A few days later, two secret police officers came to the Gilaj home to question her about her work in the Democratic Party. Mr.

Gilaj was not home. The police threatened her and asked about her son's address in the United States. They threatened to kill her and apparently were in the process of sexually assaulting her when relatives arrived. The police then left. See id. at 280-81.

In October 2000 thousands of people, including Mrs. Gilaj, participated in a demonstration in which Democratic Party members were protesting what they viewed as the manipulation of elections by the Socialists. She was arrested and jailed for two days. Mrs. Gilaj was placed in a crowded cell and denied food during her detention. She was also beaten by the police. The police also grabbed a cross from around Mrs. Gilaj's neck, threw it on the floor, told her to step on it, slapped her face when she bent over to retrieve it, and said that the Muslim majority would "disappear" all Catholics from Albania. After her release from jail, Mrs. Gilaj continued to receive threatening phone calls. Soon thereafter, Mr. and Mrs. Gilaj arrived in the United States. See id. at 281.

The Court in Gilaj found that the immigration judge's decision that the aforementioned incidents of abuse did not rise to the level of persecution was not supported by substantial evidence. See id. at 285. Significantly, the immigration judge had found the petitioners to be credible, so their allegations on review were accepted as true. See id. at 285-86. The Court found, however, that in considering whether the petitioners were persecuted, the immigration judge failed to take several

12

of the instances of the abuse into account. See id. at 286. Upon considering all of the incidents individually and in the overall context of the Gilaj family's situation, the Court determined that the record supported a finding that Mrs. Gilaj was subject to past persecution because of her political activities and opinion. See id. at 287.

While there are some similarities between the facts of this case and those in Gilaj, the allegations of persecution in the case sub judice are not as egregious. Moreover, the immigration judge in this case determined that there were inconsistencies between the testimony at the hearing and the allegations in the Jakus' application for asylum. We conclude that substantial evidence supports the immigration judge's determination that Jaku established neither past persecution nor a well-founded fear of future persecution. Accordingly, the Petitioners have failed to establish eligibility for asylum or withholding of removal.

The Petitioners also assert a claim for withholding of removal under the Convention Against Torture. Pursuant to the Convention Against Torture, a petitioner must establish that it is more likely than not that he will be tortured in the proposed country of removal, but need not show that he will be tortured on a protected ground. See 8 C.F.R. § 208.16(c)(2); Castellano-Chacon, 341 F.3d at 551-52. Jaku did not produce evidence that he was tortured in Albania. See 8 C.F.R. § 208.16(c)(3)(i) (evidence that an applicant has suffered past acts of torture is relevant to the analysis

13

of whether he is ineligible for withholding of removal under the Convention Against Torture). Moreover, nothing in the record suggests that Jaku will be tortured upon his return to Albania. During the hearing, Jaku testified that some villages in Albania support the Democratic Party and some support the Socialists. Jaku provided no reason why he could not settle in a region that is sympathetic to the Democratic Party. See 8 C.F.R. § 208.16(c)(3)(ii) (evidence that the applicant could move to a part of the country where he is unlikely to be tortured is a relevant factor in the analysis). Because Jaku has not shown that it is "more likely than not" that he would be tortured upon his return to Albania, the Petitioners are not eligible for withholding of removal under the Convention Against Torture.

### III. CONCLUSION

For the foregoing reasons, the petition for review of the decision of the BIA is **DENIED**.