NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 08a0223n.06
Filed: April 24, 2008

No. 07-3873

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| NOVRUS LAMAJ, LILJANA LAMAJ, and NALTON LAMAJ, | ) ) ) | |
| | ) | ON APPEAL FROM THE BOARD OF |
| Petitioners-Appellants, | ) | IMMIGRATION APPEALS |
| | ) | |
| v. | ) | |
| | ) | OPINION |
| MICHAEL B. MUKASEY, | ) | |
| | ) | |
| Respondent-Appellee. | ) | |
| | ) | |

Before: DAUGHTREY, GILMAN, and ROGERS, Circuit Judges.

**RONALD LEE GILMAN, Circuit Judge.** Novrus Lamaj is an Albanian national seeking asylum, withholding of removal, and relief under the Convention Against Torture (CAT) for himself, his wife, and their son. (JA 141-42) He claims that he was persecuted in Albania because of his membership in the Albanian Democratic Party. The immigration judge (IJ) denied Lamaj's claims, finding that his testimony was not credible due to inconsistencies between Lamaj's asylum applications and the testimony that he gave at his asylum hearing, that the incidents alleged by Lamaj do not meet the test for past persecution, either generally or on account of his political opinions, and that changed country conditions in Albania preclude a well-founded fear of future persecution. Lamaj appealed that determination to the Board of Immigration Appeals (the BIA), but the BIA

affirmed the IJ's decision. Because we find that the evidence does not compel a contrary conclusion, we **AFFIRM** the judgment of the BIA.

## I.  BACKGROUND

Lamaj, a native and citizen of Albania, entered the United States in July of 1999 on a B-2 visa as a nonimmigrant visitor for pleasure. He was authorized to remain in the United States until January of 2000, but he stayed past that date. (JA 141, 258) Within one year of his entry into the United States, he filed an application for asylum that listed his wife Liljana and son Nalton as derivative beneficiaries. (JA 258, 265) They are also natives and citizens of Albania. Liljana and Nalton entered the United States in July of 2002 without being admitted or inspected. (JA 142, 260)

Lamaj claims that he was persecuted in Albania because of his membership in the Albanian Democratic Party and because of his political opinions. He asserts that his father and uncle were imprisoned in the 1940s for their anticommunist activities, and that he was active in politics, including his role as a founding member of the Democratic Party's local organization in his hometown. (JA 284) He cites the following purported instances of persecution in support of his asylum application and his present appeal:  (1) he was "mistreated" during his two years of mandatory military service by being given a pick and a shovel to dig trenches instead of being "trusted" with a weapon, (2) he was detained by the police, once in 1991 and twice in 1998, following his participation in political demonstrations, and (3) he was stabbed and seriously injured by three unknown assailants when returning home from the funeral of the deceased Democratic Party leader. (JA 269-71) The relevant details of each incident are set forth in the Analysis in Part II.B.

2

below. Lamaj further claims to be afraid that, if he were to return to Albania, his life would be in danger and he would be arrested, imprisoned, and perhaps killed. (JA 285)

In November of 1999, an asylum officer interviewed Lamaj regarding his application. (JA 286-88) The officer found Lamaj's testimony to be consistent and credible, but ultimately determined that Lamaj was ineligible for asylum because his fear of future persecution was not well-founded. Specifically, the officer concluded that the threat that Lamaj feared no longer existed because conditions in Albania had improved following the resignation in late 1998 of Prime Minister Fatos Nano, a member of the Socialist Party (formerly the Communist Party), and because of other changes in Albanian political leadership that occurred in 1999. (JA 287) The Immigration and Naturalization Service (INS), now the Department of Homeland Security's Immigration and Customs Enforcement (ICE), thereafter commenced removal proceedings against Lamaj in March of 2002 and against Liljana and Nalton in September of 2002. (JA 420, 422) Lamaj filed a supplemental asylum application in 2003, repeating the claims that are set forth in his initial application. (JA 141)

An asylum hearing before an IJ took place in October of 2005. (JA 51) At the hearing, the Lamajs conceded their removability and Novrus Lamaj testified to the events that form the basis of his asylum applications. (JA 51, 53-55) The IJ, however, denied Lamaj's application for asylum, withholding of removal, and relief under CAT because she found that Lamaj's testimony was not credible, that the claimed incidents of persecution were not based on Lamaj's political opinions and were not sufficient deprivations of liberty to constitute past persecution, and that country conditions in Albania had changed for the better. (JA 44-49)

Lamaj's claims were found to be not credible because of material inconsistencies between the facts asserted in his asylum applications and the testimony that he gave at his hearing. (JA 39-42) The IJ noted in particular that Lamaj's asylum applications stated that he had been beaten during the three alleged detentions by the secret police, but that he insisted at the hearing that he had in fact *not* been beaten. (JA 40-42) Lamaj also failed to submit any corroborative evidence of the detentions. (JA 42)

Next, the IJ determined that Lamaj had failed to show that any of the alleged incidents amounted to persecution or occurred on account of his political opinions. The IJ explained that Lamaj had "established, at best, brief encounters with the authorities prior to the fall of communism" and "an attack during the time when Albania itself was undergoing significant anarchy." (JA 44-45) Furthermore, the IJ observed, Lamaj admitted that the attack in which he was stabbed was perpetrated by unknown individuals, and that Lamaj had therefore "failed to show a reasonable probability or even a clear probability that the attack directed against him that he is most fearful [of] derives in part from a protected ground." (JA 45)

Finally, the IJ determined that Lamaj was not eligible for asylum because, even if his claims were credible and the incidents amounted to persecution, the government established that country conditions in Albania had changed following the election of democratic political leadership to such an extent that Lamaj's alleged fear of future persecution in Albania was no longer well-founded. Lamaj testified, for example, that he had not experienced any problems from 1992 to 1997, when the Democratic Party was in power. (JA 84) He could also avoid any potential persecution, according to the IJ, by relocating within Albania as his brothers have done. (JA 47-48)

4

Lamaj appealed the IJ's decision to the BIA, but without success. (JA 4-5) The BIA affirmed the IJ's findings, commenting that "[t]he concerns raised by the Immigration Judge have not been persuasively explained before the Immigration Judge or on appeal before us." (JA 4) It also briefly addressed a claim that Lamaj had raised regarding alleged deficiencies in the interpretation of his hearing testimony. (JA 5) That issue, however, has not been raised in the appeal before us. For the reasons set forth below, we **AFFIRM** the judgment of the BIA.

## II. ANALYSIS

**A.     Asylum claim**

The BIA affirmed the IJ's decision by adopting the IJ's reasoning and providing its own commentary. Accordingly, we will directly review the IJ's decision and also consider the additional comments of the BIA. *Gilaj v. Gonzales*, 408 F.3d 275, 283 (6th Cir. 2005).

The IJ's factual findings, and her conclusion that the petitioner failed to establish eligibility for asylum, will be affirmed if substantial evidence supports such determinations. *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992) (upholding the IJ's rulings where "supported by reasonable, substantial, and probative evidence on the record considered as a whole") (citation omitted). Under this standard, we will not reverse a factual determination of the IJ unless we find "that the evidence not only supports a contrary conclusion, but *compels* it." *Marku v. Ashcroft*, 380 F.3d 982, 986 (6th Cir. 2004) (emphasis in original). Questions of law involving immigration proceedings, on the other hand, are reviewed de novo. *Ali v. Ashcroft*, 366 F.3d 407, 409 (6th Cir. 2004).

5

Under the Immigration and Nationality Act (INA), 8 U.S.C. § 1158(b), the U.S. Attorney General has discretion to grant asylum to a refugee. The disposition of an application for asylum involves a two-step inquiry: (1) whether the applicant qualifies as a "refugee" as defined in 8 U.S.C. § 1101(a)(42)(A), and (2) whether the applicant "merits a favorable exercise of discretion by the Attorney General." *Perkovic v. INS*, 33 F.3d 615, 620 (6th Cir. 1994) (citing *INS v. Cardoza-Fonseca,* 480 U.S. 421, 428 n.5 (1987)).

Section § 1101(a)(42)(A) of the INA defines a "refugee" as an alien who is unable or unwilling to return to his or her home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." An applicant may therefore establish eligibility for asylum by showing that he or she (1) has suffered past persecution, or (2) has a well-founded fear of future persecution. 8 C.F.R. § 208.13(b). The burden is on the applicant to establish that he or she qualifies as a refugee. 8 C.F.R. § 1208.13(a). If credible, the applicant's testimony "may be sufficient to sustain the burden of proof without corroboration." 8 C.F.R. § 1208.13(a).

Once the applicant shows that he or she has suffered from past persecution, the applicant is presumed to have a well-founded fear of future persecution. *Mikhailevitch v. INS*, 146 F.3d 384, 389 (6th Cir. 1998). This presumption can be rebutted by the government "only through establishing by a preponderance of the evidence that since the persecution occurred, conditions in the applicant's country have changed to such an extent that the applicant no longer has a well-founded fear of being persecuted if he were to return." *Id.* (citation and internal quotation marks omitted).

1.      ***The IJ's adverse credibility determination***

Credibility determinations are findings of fact and are therefore reviewed under the "substantial evidence" standard. *Yu v. Ashcroft*, 364 F.3d 700, 703 (6th Cir. 2004). "Even so, the immigration judge's conclusion must be supported by specific reasons and must be based upon issues that go to the heart of the applicant's claim." *Chen v. Gonzales*, 447 F.3d 468, 472 (6th Cir. 2006) (internal quotation marks omitted). "[C]redibility encompasses not just consistency, but also plausibility and sufficient detail." *Dorosh v. Ashcroft*, 398 F.3d 379, 382 (6th Cir. 2004). A credibility finding, like other factual findings, will be reversed "only if any reasonable adjudicator would be compelled to conclude to the contrary." *Yu*, 364 F.3d at 703 (quoting 8 U.S.C. § 1252(b)(4)(B)) (internal quotation marks omitted).

In this case, the IJ's adverse credibility determination was based largely on the fact that Lamaj asserted in his asylum applications and later stated in his asylum interview that he had been beaten during his three alleged detentions. But Lamaj repeatedly stated in his testimony before the IJ that he had in fact not been beaten during any of his detentions, and instead that the "worst thing" that happened was that he was pushed, humiliated, cursed, offended, and insulted. (JA 40, 86, 89, 102-04) When asked about the inconsistency, Lamaj suggested that the person who had translated his initial application had added the allegations that Lamaj had been beaten. (JA 102-03) The same allegations, however, reappeared in his supplemental asylum application, which was filed four years after the initial one. Moreover, the asylum officer noted in his January 2000 letter recommending the denial of asylum, following Lamaj's asylum interview, that Lamaj had stated that he was beaten during the alleged detentions. (JA 145, 286) In the present appeal, Lamaj again confirms that he was not in fact beaten when he was detained. (Lamaj Br. 12-13)

7

Lamaj also points to the stabbing that he allegedly suffered at the hands of unknown assailants following his attendance at the funeral of a former Democratic Party leader. (Lamaj Br. 14, 16) He claims that his attackers asked if he was returning from the funeral, called him a "dog of celebration," and then stabbed him in the stomach. (JA 87) The IJ, however, was troubled by Lamaj's inconsistent descriptions of the attack—specifically, that he initially testified that the encounter lasted a long time, but later said that it lasted "for a moment, you know, two minutes." (JA 44) Lamaj also alleged that, as a result of the attack, he lost two liters of blood and that a portion of his intestine was removed. (JA 87-88) But the IJ noted that the medical records that Lamaj submitted to corroborate this claim stated only that parts of his small intestine and colon were *damaged*, and did not indicate the cause of the injury. (JA 44)

Other proof submitted by Lamaj consisted of documentary evidence of his affiliation with the Albanian Democratic Party. But none of the documents—procured for the specific purpose of supporting his asylum application—mentions the arrests, detentions, beatings, or the stabbing that Lamaj claims to have experienced. (JA 154-92)

Although the discrepancies in Lamaj's descriptions of the details of the stabbing are less problematic than the inconsistencies regarding his detentions, we nevertheless conclude that, in light of all the evidence of record, the IJ's adverse credibility determination was based on "specific reasons" that "go to the heart" of Lamaj's claims of political persecution and fear of returning to Albania. *See Chen*, 447 F.3d at 472. And because Lamaj's testimony "plausibly could be viewed as incredible, and certainly could be viewed as inconsistent . . . , a fact finder reasonably could find that [his] testimony, absent corroboration, was insufficient to meet his burden of proof." *Pilica v. Ashcroft*, 388 F.3d 941, 954 (6th Cir. 2004). We therefore conclude that substantial evidence

supports the IJ's adverse credibility determination and does not compel a conclusion to the contrary. *See Yu*, 364 F.3d at 703.

### 2. *Lamaj's claims of past persecution based on his political opinions*

In addition to finding that Lamaj's claims of past persecution were not credible, the IJ concluded that Lamaj had failed to establish that the alleged acts of persecution occurred because of his political opinions or that the incidents rose to the level of "persecution" for purposes of establishing his eligibility for asylum. (JA 44) We agree. The IJ's decision denying Lamaj asylum may therefore be affirmed on the alternative ground that Lamaj, even assuming the credibility of his testimony, failed to meet his burden of proving that he suffered actual past persecution. *See Pilica*, 388 F.3d at 954.

The INA provides no definition of "persecution." This court, however, has determined that "'persecution' within the meaning of 8 U.S.C. § 1101(a)(42)(A) requires more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty." *Mikhailevitch v. INS*, 146 F.3d 384, 390 (6th Cir. 1998); *see also Gilaj v. Gonzales*, 408 F.3d 275, 285 (6th Cir. 2005) ("It is not sufficient that the applicant has been subjected to indiscriminate abuse, such as physical force or violence employed against a crowd of demonstrators, or has been the victim of a random crime."). Physical abuse "that does not require medical treatment does not *compel* a finding of persecution." *See Kacaj v. Gonzales*, 132 F. App'x 584, 588 (6th Cir. 2005) (citing cases) (emphasis in original). Furthermore, an applicant "must establish that he or she was specifically targeted by the government for abuse based on one of the statutorily protected grounds." *Gilaj*, 408 F.3d at 285.

9

With regard to the purported "mistreatment" that Lamaj experienced during his mandatory service in the army, he was unable to articulate any factual basis supporting his assertion that he was not given a weapon on account of either his family ties or his political opinions. (JA 71-73) Lamaj conceded at his hearing before the IJ that he had concluded "on his own" that he was not given a weapon because of his family's political activities, and provided no other grounds for that conclusion. *See* 8 U.S.C. § 1101(a)(42)(A) (requiring that the motive for persecution be "on account of" one of five statutorily protected categories). Lamaj's claim that he was stabbed at the hands of unknown assailants also fails to show that he was politically persecuted because he provided no evidence that he was "targeted *by the government* for abuse." *Gilaj*, 408 F.3d at 285 (emphasis added).

This leaves only Lamaj's claims that he was arrested and detained because he participated in political demonstrations. Lamaj alleged that the first arrest and detention occurred in February of 1991. His asylum applications assert that he was beaten on that occasion, but during his hearing he denied that any beating took place. (Lamaj Br. 12; JA 102-08) The next detention allegedly occurred in September of 1998 and lasted for 24 hours. Lamaj testified that civilians were permitted to enter the jail and address the detainees. (JA 85-86) He claimed that the civilians were "questioning" the detainees, "saying bad words to us," and "offending us" by saying: "You want to take the weapons and take the government again, but you'll never . . . see that day . . . ." (JA 85-86) They also allegedly told the detainees, "[w]e're going to kill you, we're going to do this, we're going to do that." (JA 85-86) But Lamaj confirmed at his hearing that "the worst thing that happened" to him during this detention was being "offended, pressured, and cursed." (JA 103)

Lamaj claims to have been detained for the last time in December of 1998 for three days, also following a protest. He complained that he was given only tea and bread to eat, and that the jail was dark and cold. (JA 89) Although he said that he contracted a cold as a result of that detention, he conceded that he did not need medical treatment for anything else. (JA 89, 102)

In sum, Lamaj alleges that he experienced only short periods of detention and has confirmed that he was not beaten or physically abused during any of them. (Lamaj Br. 12) His uncorroborated claims of brief detentions—involving verbal harassment but unaccompanied by allegations of physical abuse or the need for medical treatment (other than treatment for a cold)—do not, however, compel a finding of actual persecution. *See, e.g.*, *Matic v. Mukasey*, 2008 U.S. App. LEXIS 4470, at *14 (6th Cir. Feb. 29, 2008) (finding that beatings by an acquaintance and unknown assailants "did not amount to persecution" sufficient to justify the withholding of removal); *Gilaj*, 408 F.3d at 284 (citing cases where asylum applicants had failed to establish persecution despite having been detained for up to three days, interrogated, and beaten (though not requiring medical attention)); *Pilica v. Ashcroft*, 388 F.3d 941, 954 (6th Cir. 2004) (finding no persecution where the petitioner, following two demonstrations, was arrested, detained for a week, and allegedly mistreated by being sworn at, and where he was beaten about the head by policemen after a third demonstration); *Gjokic v. Ashcroft*, 104 F. App'x 501, 502, 505 (6th Cir. 2004) (upholding an IJ's finding of no persecution regarding an alien who had been detained for several days after attending a demonstration, and who was beaten with rubber sticks that caused bruising but no permanent injuries, because the petitioner had not distinguished himself from the thousands of other demonstrators).

### 3. *Lamaj's claim of a well-founded fear of future persecution*

11

Because Lamaj did not sustain his burden of establishing that he suffered past persecution, he is not entitled to the presumption of a well-founded fear of suffering future persecution. *See Mikhailevitch*, 146 F.3d at 390. His arguments on this point do not require a lengthy discussion because the government established in the present case that conditions in Albania have fundamentally changed for the better since the leader of the Albanian Democratic Party, Sali Berisha, was elected Prime Minister in 2005. (JA 117-37) The IJ also pointed to Lamaj's concession that he experienced no persecution when the Democratic Party was previously in power from 1992 to 1997. (JA 97)

This court, moreover, has repeatedly held that country conditions in Albania have changed to such a degree that Albanian asylum-seekers no longer have a reason to fear persecution if they return to Albania. *See, e.g.*, *Lumaj v. Gonzales*, 462 F.3d 574, 578 (6th Cir. 2006) ("[T]he Country Conditions Report for Albania indicates that while there is a danger of violence in Albania, it is due mostly to individual acts or organized crime, and there is virtually no evidence that individuals are targeted for mistreatment on political grounds." (internal quotation marks omitted)); *Macotaj v. Gonzales*, 424 F.3d 464, 465 (6th Cir. 2005) ("As with many similar cases that we have reviewed since the overthrow of the Communist regime in Albania, we find that . . . , despite whatever political repression [the petitioner] and his family may have suffered in the past, conditions in Albania have changed to such an extent that [the petitioner] no longer has reason to fear persecution upon return to his homeland."). We likewise conclude that the evidence in the present case does not compel a conclusion to the contrary.

**B.      Withholding of removal and relief under the CAT**

Because Lamaj has not satisfied the requirements for establishing his eligibility for asylum, he "cannot meet the more stringent standards required to qualify for the protections of withholding of removal or under CAT." *Bah v. Gonzales*, 462 F.3d 637, 643 (6th Cir. 2006).

### III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the BIA.