NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0947n.06
Filed: December 5, 2005

**No. 04-4237**


**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

ERVIN SULOLLARI,

     **Petitioner-Appellant,**

v.                                                          **ON APPEAL FROM THE BOARD OF
                                                            IMMIGRATION APPEALS**

ALBERTO R. GONZALES, United States
Attorney General,

     **Respondent-Appellee.**

                                 /


**BEFORE:** **KEITH, SUHRHEINRICH, and CLAY**, **Circuit Judges.**

     **CLAY, Circuit Judge.** Petitioner-Appellant Ervin Sulorllari ("Petitioner") appeals an order

of the Board of Immigration Appeals ("BIA"), entered September 9, 2004, denying his requests for

asylum and withholding of removal under the Immigration and Nationality Act ("INA"), 8 U.S.C.

§ 1101 *et seq.*, withholding of removal under the Convention Against Torture ("CAT"), 8 U.S.C.

§ 2340 *et seq.*, and voluntary departure.   Specifically, Petitioner contends that: (1) substantial

evidence does not support the Immigration Judge's ("IJ") adverse credibility determination; (2) the

Board of Immigration Appeals ("BIA") denied Petitioner meaningful review of his claim in violation

of the Fifth Amendment's Due Process Clause; and (3) the IJ's conduct at the merits hearing

violated Petitioner's Fifth Amendment due process rights. For the reasons set forth below, this Court **DENIES** the petition for review.

## I.
## BACKGROUND

### A. Procedural History

Petitioner Erwin Sulollari entered the United States on May 31, 2000. On March 12, 2001, Petitioner timely filed an application for asylum and withholding of removal. Thereafter, on April 12, 2001, the Immigration and Nationality Service ("INS") issued a Notice to Appear, charging Petitioner with being subject to removal pursuant to 8 U.S.C. § 1227(a)(1)(A) for entering the United States without a valid visa. Petitioner first appeared before the IJ on August 21, 2001. The IJ informed Petitioner of his right to counsel and a hearing. Thereafter, Petitioner retained counsel and conceded his removability at a hearing before the IJ on November 27, 2001. At that time, Petitioner also renewed his requests for asylum, withholding of removal, and voluntary departure. After a merits hearing on April 2, 2003, at which Petitioner testified, the IJ denied all of Petitioner's requests for relief. Petitioner appealed the IJ's decision to the BIA, which affirmed and adopted the IJ's order on September 9, 2004. On October 12, 2004, Petitioner timely filed a petition for review of the BIA's decision with this Court.

### B. Substantive Facts

Petitioner is a native and citizen of Albania. According to Petitioner, he is a member of the Youth Forum Democratic Party of Albania and was actively involved in promoting the Democratic Party in Albania from 1995 until he left in 2000. Petitioner claims that he will be subjected to persecution if forced to return to Albania.

2

In his application and testimony, Petitioner alleges seven incidents of police persecution in support of his request for asylum. The first incident allegedly occurred on June 29, 1997 after elections brought the socialist party to power. Petitioner claims that "left wing extremists" beat him. (J.A. at 142.) The second incident occurred on August 3, 1997, after Petitioner participated in a demonstration. According to Petitioner, he remained in police detention for a week, during which the police beat him. The third incident involved a police raid on Petitioner's home on February 26, 1998. Petitioner's application states that the police beat him until he was bloody. At the merits hearing, Petitioner testified that as a result of the beating he went to the hospital for stitches. The fourth incident, occurring on August 10, 1998, again arose out of Petitioner's participation in a demonstration. According to his application, the secret service subjected him to unspecified "maltreatment." (J.A. at 142.) The fifth incident occurred on September 13, 1998, around the time of Democratic Party leader Azem Hadji's assassination. Petitioner claims he was again detained, this time for approximately six days. As a condition of his release, the police imposed a bi-weekly reporting requirement on him that lasted until May of 1999. One year later, on September 10, 1999, the anniversary of Hadji's assassination, the sixth incident occurred. Petitioner's application states he was detained. In his testimony, Petitioner elaborated that he was detained for three days. Finally, Petitioner was briefly detained in a police van on April 25, 2000 after he failed to report to the police station as the police requested. There is some confusion surrounding the reporting requirement that led to this seventh incident. It seems that it was not a result of the September arrest but a second police imposition of a reporting requirement on Petitioner.

Petitioner reached the United States on May 31, 2000, after escaping from his last detention on April 25, 2000. At the merits hearing, Petitioner first stated he jumped out the front door of the police van in order to escape. He subsequently clarified that it was one of the van's two side doors. According to Petitioner, he was able to escape because the police did not lock the door or handcuff him. Petitioner testified that the Albanian police chased him, but that the police did not attempt to shoot him.

To corroborate his claims of persecution, Petitioner submitted letters from Democratic Party leaders in Albania allegedly familiar with the persecution Petitioner suffered. None of the letters mention any of Petitioner's arrests, and one letter even incorrectly states that Petitioner served on an election commission. Additionally, although the letters are typed, the dates on the letters are handwritten and the letters do not contain any diacritical marks, which typically accompany certain letters in the Albanian alphabet.

The IJ denied Petitioner's claim for asylum in an oral decision after the merits hearing. The IJ held that Petitioner had failed to establish that he had a well-founded fear of persecution if returned to Albania. The IJ based his decision on what he deemed to be "inconsistencies" in Petitioner's testimony, thereby rendering the Petitioner's testimony unbelievable. He also held that the letters were forgeries, and thus, did not support Petitioner's claims. The IJ reasoned that because Petitioner's testimony and letters were his sole evidence of past persecution, Petitioner failed to establish a well-founded fear of future persecution, and thus failed to demonstrate that he was eligible for asylum.

## II.
## DISCUSSION

### A.    SUBSTANTIAL EVIDENCE SUPPORTS THE BIA'S DECISION

#### 1.    Standard of Review

This Court reviews factual findings of the BIA, including credibility determination, for substantial evidence. *Vasha v. Gonzales*, 410 F.3d 863, 869 (6th Cir. 2005) (citing *Sylla v. INS,* 388 F.3d 924, 925 (6th Cir. 2004)). Under the substantial evidence standard, this Court must uphold the BIA's findings unless a reasonable adjudicator, examining the record as a whole, would be compelled to a contrary conclusion. *Id.*

"Where the BIA adopts the IJ's reasoning, [this Court] reviews the IJ's decision directly to determine whether the decision of the BIA should be upheld on appeal." *Gilaj v. Gonzales*, 408 F.3d 275, 282-83 (6th Cir. 2005) (citing *Denko v. INS* 351 F.3d 717, 723 (6th Cir. 2003)). When reviewing the IJ's decision, however, this Court will also consider any additional comments of the BIA. *Id.* at 283.

#### 2.    Analysis

Despite reservations about the rationale employed by the IJ, the credibility determination is supported by substantial evidence. The IJ based his adverse credibility determination on the following "inconsistencies:"

(1)    Petitioner's claims of persecution conflict with known country conditions;
(2)    Petitioner documentary evidence is forged and does not corroborate Petitioner's claim of persecution;
(3)    Petitioner's testimony is more detailed than his application;
(4)    Petitioner's testimony is insufficiently detailed; and
(5)    Petitioner's testimony is internally inconsistent and inconsistent with his application.

Although many of these "inconsistencies" are either irrelevant or not inconsistencies at all, a sufficient number of relevant inconsistencies exist thereby requiring this Court to deny the petition for review. More specifically, this Court must uphold the IJ's credibility determination based on the IJ's findings that (1) Petitioner's claims conflict with known country conditions; and (2) Petitioner's letters fail to corroborate his testimony. Nonetheless, we note that several of the IJ's findings cause this Court serious concern, including his: (1) misuse of country reports; (2) handling of foreign language documents; and (3) expectation regarding the level of detail on asylum applications.

### a. Albania Country Condition Reports

The IJ found that Petitioner's claims of persecution conflict with Albania's known country conditions as described in three state department reports: two reports on human rights abuses and one profile on Albanian asylum claims. Because the asylum profile expressly states that there has been little to no political persecution in Albania since the collapse of the Communist regime in 1990, (J.A. at 123), and notes that even "during the dark days of 1997" all parties were able to participate in politics without mistreatment, ( J.A. at 124), the record does not compel a reasonable person to reject the IJ's finding of conflict. Therefore, substantial evidence supports the IJ's determination that Petitioner's claims conflict with known country conditions.

Nonetheless, this Court is disturbed by portions of the IJ's analysis, in particular his use of the human rights reports. These reports describe Albania's conditions in 2000 and 2001. In contrast, the incidents of persecution that the Petitioner describes in his testimony and application occurred primarily in 1997 and 1998. Only one incident out of the seven incidents Petitioner

6

describes occurred in 2000 or thereafter, and this incident was not nearly as severe as the earlier incidents. Moreover, the IJ's primary concern seems to be the incident occurring in June of 1997. The IJ does not even consider the incident occurring in 2000 when determining that the known country conditions conflict with Petitioner's claims. Thus, the IJ's determination that Petitioner's account conflicts with known country conditions is somewhat deceptive.

Additionally, the IJ mischaracterizes the human rights reports (but not the asylum profile) with his selective references. A neutral reading of the *entire* reports reveals that the human rights reports do not contradict Petitioner's claims of persecution. For example, the IJ notes that the State Department reports state that there were no confirmed, politically motivated killings or disappearances, despite claims of Democratic Party members to the contrary. Although the IJ's assertion is correct, the country reports are nonetheless replete with reference to political violence directed at Democratic Party activists. In fact, the 2001 report explicitly states that the police in Fier detained and beat persons from the Democratic Party. Additionally it states that "[w]hile the police generally handled the [Democratic Party] demonstrations following the October elections in a restrained manner, there were instances where the police beat and mistreated DP supporters." (J.A. at 111.) In light of Petitioner's claims that the police beat and detained him, the above reference and quote is considerably more relevant to Petitioner's claims than the IJ's references to disappearances and politically motivated killings. Finally, although the state department has been unable to confirm all of the Democratic Party's allegations of government violence, this does not mean that the violence did not occur.

**b.     Petitioner's Letters From Albania**

7

Next, the IJ determined that the letters Petitioner submitted to the Court to corroborate his claim of persecution are forgeries, and therefore, "torpedo" his claim of persecution. (J.A. at 44.) The IJ based his determination that the letters are forgeries on: (1) the lack of diacritical marks; (2) the blank date spaces; (3) an incorrect statement in one of the letters; and (4) the failure of the letters to mention Petitioner's arrests. Substantial evidence supports the IJ's determination that the letters do not corroborate Petitioner's claims, but not that the missing diacritical marks indicate that the letters are forged.

The Petitioner bears the burden of proving his or her eligibility for asylum. *Liti v. Gonzales*, 411 F.3d 631, 637 (6th Cir. 2005). That burden may require the Petitioner to submit corroborating evidence of his or her claim of persecution where such evidence is reasonably available. *Id.* at 640. Here, Petitioner failed to submit corroborating evidence despite his testimony that such evidence was available. Petitioner testified that other persons knew of his arrests, including an author of one of the letters Petitioner submitted to the IJ. None of the letters, however, mention Petitioner's arrests. Moreover, another letter incorrectly states that Petitioner served on an election commission. Petitioner admits that he never served on an election commission. In light of these omissions and incorrect statements, substantial evidence supports the IJ's finding that the letters do not corroborate Petitioner's claims of persecution.

The IJ was not justified, however, in independently assessing the meaning of missing diacritical marks. *See Sylla*, 388 F.3d at 928 (holding that an IJ could not speculate on typical prison conditions in Guiana but needed to base his credibility determination on evidence in the actual record). There is no evidence in the record that suggests that the missing diacritical marks are

typical of forgeries. *See id.* Although Petitioner admitted that diacritical marks are missing he expressly stated that it was not a "big deal" for diacritical marks to be missing. (J.A. at 87.) The IJ has no knowledge of the Albanian language or culture, and the prosecution failed to introduce any evidence indicating that the missing marks render the letters unreliable. Therefore, there is absolutely no evidence in the record to support a finding that the letters are forgeries.

### c.     Petitioner's Asylum Application

Additionally, the IJ found that Petitioner's testimony is inconsistent with his application because his testimony is more detailed than his application. In particular, the IJ took issue with the application's omission of Petitioner's alleged hospitalization after a police raid of his home in February 1998 and the length of Petitioner's alleged detention in September 1999. As this Court has previously held, however, omissions of details from a petitioner's application that are more fully explained at a hearing are not inconsistencies upon which an IJ can rest an adverse credibility determination. *Litti*, 411 F.3d at 638-39. In *Litti*, this Court explained:

> the circumstances surrounding the application process do not often lend themselves to a perfectly complete and comprehensive recitation of an applicant's claim to asylum or withholding, and holding applicants to such a standard is not only unrealistic but unfair. . . . [T]he form utilized by the INS for applications for asylum and withholding provides half a page for applicant's to explain why he or she is seeking asylum, and no more than two inches to recount mistreatment or threats against the applicant or the applicant's family by the government or other groups . . . . Therefore, because the statements in the application were not inconsistent with the [applicant's] subsequent testimony of the specific events at their removal hearing, we conclude that the BIA's adverse credibility finding is unsupported by the evidence.

*Id.* (internal citations and quotation marks omitted).

Here, Petitioner stated in his application that the Albanian police raided his home in February 1998 and detained him in September 1999. His application further notes that the police beat him until he was bloody in the February raid. He recounted these events at the hearing in more detail, which included going to the hospital for stitches after the raid and remaining in detention for three days after the September 1999 arrest. Petitioner's testimony at the hearing was in no way inconsistent with his application. Moreover, Petitioner's omission of insignificant details in his application in no way indicates that his testimony was untruthful. As noted in *Litti*, the asylum application does not provide the applicant with sufficient space to include every detail of persecution, especially when the persecution occurred over a number of years. *Id.* Additionally, the application itself only asks applicants if they have been "mistreated" or "detained." It does not specifically indicate that the applicant need list hospitalizations resulting from mistreatment or the length of a particular detention. Therefore, the record does not support the IJ's finding that these omissions were inconsistencies.

###### d. Remaining Inconsistencies

The IJ also found numerous other "inconsistencies" in Petitioner's testimony stemming from the testimony's alleged internal inconsistency, conflict with the application, and vagueness. Many of these inconsistencies are not inconsistencies at all or do not go the heart of Petitioner's claims.[1]

---

[1]These "inconsistencies" include: (1) testifying that he jumped out the front door of the police van on April 25, 2000 and later testifing that he jumped out the side door; (2) stating that he was arrested "after" the demonstration on August 3, 1997 on his application and testifying that he was arrested "at" the demonstration during his merits hearing; (3) failing to testify in sufficient detail about his detentions (although the IJ never asked him questions about the detentions); (4) being unable to recall the dates and reasons for some alleged hospitalizations (he did not claim he was hospitalized "many" times as the IJ claims in his opinion); (5) stating during his hearing that

These "inconsistencies," however, are not worth discussing in light the support in the record discussed above for the IJ's findings that 1) Petitioner's claims conflict with known country conditions; and 2) Petitioner failed to corroborate his story adequately.

**B.  THE BIA DID NOT DENY PETITIONER MEANINGFUL REVIEW OF HIS CLAIMS IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT**

### 1.  Standard of Review

This Court reviews an alien's due process claim *de novo.  Gilaj v. Gonzales*, 408 F.3d 275, 290 (6th Cir. 2005) (citation omitted).

### 2.  Analysis

Due process does not require the BIA to issue an independently reasoned opinion in response to an appeal from an IJ's decision.  *Denko*, 351 F.3d at 730.  Thus, the BIA's summary affirmation of an IJ's decision or order does not violate due process.  *Id.*  This is true even when the IJ's decision was inadequate or incorrect.  *See id.*  As the Court previously explained in *Denko* when it rejected a due process challenge to the BIA's summary affirmation powers:

> Even if the BIA would view the factual and legal issues differently from the immigration judge, the summary-affirmance-without-opinion rules renders the IJ's decision the final agency order, and we review that decision.  Thus, [the petitioner] receives the full and fair review that she is entitled to receive.  Moreover, in functional terms, if the BIA does not independently state a correct ground for affirmance in a case in which the reasoning proffered by the IJ is faulty, the BIA risks reversal on appeal.  Thus we are not forced to guess at the rationale of the BIA,

he was arrested on three occasions when his application listed four  (although he described four incidents in his testimony, albeit not in chronological order); and (6) testifying that the police didn't shoot at him when he jumped out of the van on April 25, 2000.  Additionally, the IJ determined that confusion surrounding the reporting requirement, and its conflict with his testimony concerning his time in Greece were inconsistencies.

but instead we evaluate the IJ's explanation as that of the Board; the Board cannot rely on an unarticulated basis for its determination.

*Id.* (internal citations and quotation marks omitted).

In this case, the BIA affirmed and adopted the decision of the IJ with one qualification. The BIA rejected any portion of the decision implying that one inconsistency was sufficient to sustain an adverse credibility finding. This Court is able to provide meaningful appellate review of the BIA's decision by reviewing the IJ's decision and order in conjunction with the BIA's additional comments. Therefore, under this Court's holding in *Denko*, Petitioner has no basis for his Due Process claim. Importantly, Petitioner has made no effort to distinguish his case from *Denko*. In fact, none of the cases upon which Petitioner relies to support his theory that the BIA's summary affirmation violates due process are due process cases. Consequently, this Court denies the petition for review.

## C.    THE IJ'S CONDUCT DURING THE MERITS HEARING DID NOT VIOLATE PETITIONER'S FIFTH AMENDMENT DUE PROCESS RIGHTS

### 1.    Standard of Review

This Court reviews an alien's due process claim *de novo*. *Gilaj v. Gonzales*, 408 F.3d at 290.

### 2.    Analysis

The IJ did not violate Petitioner's Due Process rights. The Fifth Amendment of the United States Constitution entitles aliens to due process in deportation and removal proceedings. *Denko* 351 F.3d at 726 (quoting *Reno v. Flores,* 507 U.S. 292, 306 (1993)). Due process requires the

government to grant an alien a full and fair hearing. *Vasha*, 410 F.3d at 872. To establish that a hearing was unfair such that it violated due process, an alien must demonstrate that: (1) there was a defect in the proceedings; and (2) the defect prejudiced the alien's claims. *See id*. The alien must specifically identify both the defect and the prejudice. *Gilaj,* 408 F.3d at 290 (denying alien's due process claim where the alien failed to identify prejudice specifically).

In this case, Petitioner fails to identify a specific error committed by the IJ or any prejudice resulting therefrom. Instead, Petitioner makes general and conclusory allegations including that: (1) the IJ "jump[ed] into the cross-examination" (Pet'r Br. 35); (2) the IJ created an "atmosphere of meanness and inquisition" (Pet'r Br. 35); and (3) the IJ "saw fit to quibble rather than adduce the facts of the claim" (Pet'r Br. 36). According to Petitioner, the IJ's hostile attitude inhibited Petitioner from openly recounting his story of persecution. (Pet'r Br. 35.) Petitioner, however, does not identify a single remark of the IJ to support his general allegations. Nor does Petitioner explain in what way his testimony would have differed if the IJ had been more receptive. Although this Court recognizes the IJ's skepticism, we are unable to identify any facially inappropriate or hostile comments made at the hearing. Without more specific allegations, we are unable to review the record for due process violations. Therefore, this Court denies the petition for review.

**III.**
**CONCLUSION**

For the foregoing reasons, this Court **DENIES** the petition for review.